(No. 64506.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. JOHN PAUL PHILLIPS, Appellant.

*Opinion filed March 29, 1989.—Rehearing*
*denied May 26, 1989.*

500

WARD and CALVO, JJ., took no part.

Charles M. Schiedel, Deputy Defender and James E. Chadd, Assistant Defender, of the Office of the State Appellate Defender, of Springfield, for appellant.

Neil F. Hartigan, Attorney General, of Springfield (Robert J. Ruiz, Solicitor General, and Terence M. Madsen and Richard S. London, Assistant Attorneys General, of Chicago, of counsel, and Jean Cocozza, law student), for the People.

JUSTICE CLARK delivered the opinion of the court:

The defendant, John Paul Phillips, was indicted on April 8, 1986, by a Jackson County grand jury on five counts for the November 11, 1981, murder of Joan Weatherall. Count I charged that the defendant commit-

ted murder with the intent to kill the victim (Ill. Rev. Stat. 1981, ch. 38, par. 9—1(a)(1)); count II charged that the defendant committed murder knowing that his actions created a strong probability of death or great bodily harm (Ill. Rev. Stat. 1981, ch. 38, par. 9—1(a)(2)); counts III, IV, and V charged that the defendant committed murder while committing the forcible felonies of aggravated kidnapping in violation of section 10—2(a)(3) (Ill. Rev. Stat. 1981, ch. 38, par. 10—2(a)(3)), rape in violation of section 11—1 (Ill. Rev. Stat. 1981, ch. 38, par. 11—1), and deviate sexual assault in violation of section 11—3(a) (Ill. Rev. Stat. 1981, ch. 38, par. 11—3(a)). (Ill. Rev. Stat. 1981, ch. 38, par. 9—1(a)(3).) On defendant's motion, the place of trial was moved from Jackson County; the trial was subsequently held in Massac County. A jury found the defendant guilty of murder and felony murder in the course of aggravated kidnapping (Ill. Rev. Stat. 1981, ch. 38, pars. 9—1(a)(1), (a)(2), (a)(3)), counts I, II, and III of the indictment. He was found not guilty on counts IV and V, felony murder in the commission of a rape and felony murder in the commission of a deviate sexual act.

The defendant waived a jury for sentencing. In the two-stage sentencing proceeding, the court found defendant eligible for the death penalty and found that, in the presence of aggravating factors, there were no mitigating factors sufficient to preclude the imposition of the death penalty. The death sentence was stayed (107 Ill. 2d R. 609(a)) pending direct appeal to this court, pursuant to article VI, section 4(b), of the 1970 Illinois Constitution (Ill. Const. 1970, art. VI, §4(b)) and Supreme Court Rule 603 (107 Ill. 2d R. 603). For the reasons stated herein, we affirm the convictions and sentence.

A brief review of the facts presented here prior to a discussion of the issues raised by defendant will be sup-

plemented and expanded upon throughout this opinion as necessary for a resolution of a particular issue.

The nude body of a white female was discovered floating face down in the water of an abandoned strip pit west of Elkville, Illinois, on November 11, 1981. The woman was identified as Joan Weatherall of Carbondale, Illinois. An autopsy indicated that the primary cause of death was strangulation; a secondary cause of death was attributed to exsanguination, that is, a loss of blood, suffered as a result of blows to the head. Additionally, the autopsy indicated that one of the blows to the head had chipped her skull, that there were abrasions and contusions to her face and knees as well as indications that her hands had been tied behind her back.

During May 1984, while serving a term of years in prison, the defendant told his cellmate that he had committed a number of crimes; the defendant confessed to the rape and murder of Joan Weatherall as well as two other murders and a rape not here under consideration. The defendant's cellmate, Thomas Mocaby, informed prison officials of his knowledge of these crimes. The prison officials then contacted outside police authorities, who conducted a preliminary investigation to verify the information. The results of the investigation and the information were subsequently presented to the Jackson County grand jury which returned indictments on April 8, 1986, charging John Paul Phillips with five counts of murder.

Prior to trial on these charges and at the request of defense counsel, defendant underwent a fitness examination. The court-appointed expert, Dr. Horecker, filed his report, dated June 27, 1986, which indicated that the defendant did not have a major mental disorder, that he showed no evidence of psychosis and that he was fit to stand trial. The court reviewed Dr. Horecker's report as well as the report of another expert, Dr. Peterson, who

had previously been appointed to examine the defendant in a separate pending rape case. The court found that the defendant was fit to stand trial.

At trial, Thomas Mocaby testified that while he and John Paul Phillips were cellmates at the Menard Correctional Facility during May 1984, defendant told him the details of the 1981 Weatherall murder. Mocaby's testimony recounted the following information which had been told to him by Phillips during the time which the two shared a cell.

On the evening of November 10, 1981, Phillips first saw Joan Weatherall at Stan Hoye's, a lounge located within the Holiday Inn in Carbondale where Weatherall worked as a waitress. Later that same evening Phillips saw Weatherall, whom he described to Mocaby as a tall, very attractive woman with long hair and inverted nipples, leave another lounge located on Illinois Avenue in Carbondale. When Weatherall neared an alley behind this establishment, Phillips grabbed her and choked her until she passed out. He laid her down and went to get his wife's car, a blue Monte Carlo. The defendant put Weatherall into the trunk and then drove to his father's warehouse located on Highway 51. At the warehouse he proceeded to repeatedly rape Weatherall. After raping her, the defendant told Weatherall that he had to tie her hands behind her back but that he was going to take her back to town. After he tied her hands, however, he also tied a noose around her neck, pulled it tight and then hit her on the head with a hammer. Phillips recounted to Mocaby that Weatherall fell to the ground and spun around. Blood was splashing around and Phillips indicated that he had to step back and wait for Weatherall to stop moving. Phillips also told Mocaby, according to the testimony, that he killed her because she was defiant and because she was a "sloppy drunk." Once he realized that Weatherall was dead, Phillips took a hose and

flushed out her internal organs in order to get rid of any traces of semen. He then took the body to a loading dock at the warehouse where, he indicated, he anally assaulted the dead body before wrapping it in plastic and loading it into the trunk of his wife's Monte Carlo. Phillips then drove to the Elkville strip pit where he attempted to submerge Weatherall's body in the water.

In addition to the above description of the Weatherall murder, Mocaby told authorities that Phillips also told him about murdering two other women and about a rape of a South American or Brazilian woman. This and other trial testimony will be elaborated upon below as it becomes necessary to a discussion of points raised on appeal.

Phillips raises 11 individual issues to be resolved on appeal; four issues relate to alleged trial errors, three to alleged errors at the sentencing hearing, and four address constitutional concerns.

## THE TRIAL

Defendant first contends that he was not proven guilty beyond a reasonable doubt where, he asserts, the State's entire case was based on the testimony of a single, unreliable witness—that witness being Thomas Mocaby. In essence, the defendant is attacking the sufficiency of the evidence against him. This court has long held that it is the jury's function to determine the accused's guilt or innocence; "we will not reverse a conviction unless the evidence is so improbable as to justify a reasonable doubt of the accused's guilt. [Citations.]" (*People v. McDonald* (1975), 62 Ill. 2d 448, 456.) When faced with a challenge to the sufficiency of the evidence against the accused, it is not the function of this court to retry the defendant. (*People v. Collins* (1985), 106 Ill. 2d 237, 261.) Rather, as the United States Supreme Court noted in *Jackson v. Virginia* (1979), 443 U.S. 307, 61 L.

Ed. 2d 560, 99 S. Ct. 2781, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original.) (443 U.S. at 319, 61 L. Ed. 2d at 573, 99 S. Ct. at 2789.) The Court elaborated further by pointing out that "upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution." (Emphasis in original.) 443 U.S. at 319, 61 L. Ed. 2d at 573, 99 S. Ct. at 2789.

Upon review, we conclude that the evidence is sufficient to support the jury's verdict. Defendant's contentions that the testimony of Thomas Mocaby was the sole link connecting Phillips to the crime and, further, that Mocaby was a "thoroughly unbelievable" witness are not persuasive. As this court has often noted, it is the responsibility of the jury to weigh the credibility of the witnesses. (*People v. Kubat* (1983), 94 Ill. 2d 437, 468, *rev'd on other grounds* (7th. Cir. Jan. 24, 1989), Nos. 88—1440, 88—1520; *People v. Lewis* (1981), 88 Ill. 2d 129, 151-53; *People v. Carlson* (1980), 79 Ill. 2d 564, 583.) We have already noted above the gist of Mocaby's testimony. We note further that the jury was aware that Mocaby was a convicted felon. Moreover, Mocaby's testimony was not wholly unchallenged. The jury had to weigh Mocaby's testimony against that of defense witnesses Frank Manna, Robert Kirkpatrick, and Rick Kane, also convicted felons. These defense witnesses testified that Mocaby set Phillips up for his own personal gain. They testified that, because Mocaby had extensive financial problems (he allegedly owed money to other prisoners for drugs and had not completed tattoo work for prisoners who had already paid for the work), he wanted to be moved to another and easier prison institution.

Additionally, we note that the jury could weigh the extent of Mocaby's knowledge of facts about the murder and any question concerning the possible source of such knowledge against the contents of newspaper articles published in 1981 after Weatherall's body was found. Copies of the published articles were made available to the jury by the defendant. In addition to testimony that Mocaby was a resident of Marion, Illinois, and that he completed schooling in that city through the eleventh grade (he later earned a G.E.D.), we note that he was approximately 17 or 18 years of age at the time of the Weatherall murder. There was no testimony offered to support an inference that he ever read any newspaper articles about the murder. While it is perhaps possible, though never argued by the defense, that Mocaby could have committed the crime himself, or that he learned about it from another person, we note that his testimony included certain facts, facts which were corroborated by independent testimony and that, according to arguments in closing, were not included in the newspaper accounts. While copies of these articles were not before this court in the record, we note that no objection was made to the State's summation of facts not known by the general public. These facts asserted to not be known by the general public (those not personally associated with Weatherall), when linked together, tend to support an inference that Mocaby's source of knowledge was Phillips: that Weatherall had been drunk on the night of her murder, that she was a pretty woman with long hair, that her breasts had inverted nipples, and that the defendant drove his wife's blue Monte Carlo on the night of the murder because his own car was in the shop for repairs. Nor could reference be made to any newspaper accounts of the rape of the Brazilian woman to account for Mocaby's knowledge, a woman who, as we discuss later, had already positively identified the defendant as the rapist

who abducted her. We also note, for example, that the physical description of the condition of Weatherall's body given by Mocaby could be weighed against the testimony of Dr. Gronemeyer, who performed the autopsy. An assertion by Mocaby that Phillips had told him that Weatherall's internal organs had been hosed out after he raped her could be weighed against information from Dr. Gronemeyer that when she performed the autopsy she found no sperm but that diatoms, small algae present in fresh water, were found in Weatherall's vaginal cavity. These are examples of testimony that either corroborated Mocaby's testimony or challenged it. The jury weighed and balanced the scales and found against the defendant. We cannot say that its judgment was against the manifest weight of the evidence.

Assertions that Mocaby provided the State's sole link of Phillips to Weatherall are also without merit. Testimony from Dean Buchanan, an instructor for a Dale Carnegie course in which the defendant was enrolled, placed Phillips at the Holiday Inn in Carbondale on the last evening that Weatherall was seen alive. As noted earlier, the restaurant/bar where Weatherall worked was located in this Holiday Inn. Other testimony supported statements made by Mocaby. For example, testimony from Dennis Howell, parts manager for a Carbondale auto dealer, verified that Phillips' automobile was in the shop for repairs and thus unavailable for his use. Testimony from Delores Otterson, Phillips' former wife, verified that the defendant had used her car, a blue Monte Carlo, on the evening of November 10, 1981. Andrew Wist, a forensic scientist with the Illinois Department of State Police, testified that certain hair strands found in the Monte Carlo were consistent with the hair of Joan Weatherall. While a defense expert disagreed with this evaluation, the jury could weigh the testimony of each expert in reaching its decision. Testimony was elicited

from both Dr. Gronemeyer and Phyllis Weatherall, sister of the victim, about the condition of Joan Weatherall's breasts—information that would not be known by the general public (Mocaby had testified that Phillips told him that Weatherall's nipples were inverted). The jury was able to weigh and evaluate this testimony.

Further, in testimony given by Delores Otterson she testified that on November 11, 1981, the defendant came to her place of employment to get the Monte Carlo in order, he told her, to clean it. Otterson testified that Phillips had never done this in the past.

Testimony by Robert Ratcliffe (a co-worker), Nicholas Fabish (a friend), Kenneth Gilbert (an acquaintance of a friend of Joan Weatherall), and James Duke (a bartender who saw Weatherall on prior occasions and on the night she was murdered) substantiated that Joan Weatherall had been at a couple of establishments along Illinois Avenue in Carbondale; that she had had several drinks at each bar; and that she was last seen by people who knew her at approximately 1:30 a.m. on November 11. At about that time she left a bar known as The Club and was not seen again. Defense attorneys countered by putting Mike Stearns on the stand. Stearns testified that during the early morning hours of November 11, 1981, at approximately 12:30 to 1 a.m. he saw Joan Weatherall, or a woman who looked very much like her, come into Dumarocs, a bar where he worked as a disc jockey. Dumarocs is located several miles north of Carbondale on Route 51 in DeSoto. Stearns testified that he remembered the woman because she came in with two black men. He also testified that he only saw the woman from across the room and that the room was somewhat dark. It is therefore not improbable that, in weighing the testimony, the jury could find the prosecution's witnesses' testimony more credible.

The testimony of Christina Kater, a Brazilian woman who testified that she had been raped by the defendant, will not be unduly elaborated upon at this point, as it will be discussed at length below. At this point, however, we note that her testimony was capable of being construed by the jury as further substantiation or corroboration of the testimony of Mocaby and was susceptible of being weighed by the jury for the limited purpose for which it was introduced.

Applying the principles enunciated above to the testimony at trial, we find sufficient evidence to support the jury's verdict. Resolution of conflicts and/or inconsistencies in testimony is wholly within the province of the jury (*People v. Sanchez* (1986), 115 Ill. 2d 238, 261; *People v. Collins* (1985), 106 Ill. 2d 237, 262), as are determinations of witness credibility (*Sanchez*, 115 Ill. 2d at 261; *Collins*, 106 Ill. 2d at 261-62). Mocaby's testimony was subject to vigorous cross-examination, as was evidence which tended to corroborate his testimony. We cannot say that the jury's conclusion was unsupported or unreasonable under these circumstances and therefore reject defendant's attack on the sufficiency of the evidence.

The defendant next contends that he was denied a fair trial when the State was allowed to present evidence of other crimes based on a theory of *modus operandi*, intent or identity when, he asserts, that evidence lacked distinctive similarities or features which would indicate that the offenses were committed by the same individual. The disputed evidence involved the abduction and rape of Christina Kater allegedly perpetrated by Phillips on December 26, 1981. Although Philips had been charged with the Kater rape, the case had not yet gone to trial. Both Mocaby's and Kater's testimony is detailed below.

As previously indicated, Mocaby testified that Phillips told him of the abduction and rape of a South American or Brazilian woman in Carbondale. At the time that Mocaby and Phillips shared a cell, Phillips had already been identified by Christina Kater as the rapist. Because she had returned to Brazil, however, Phillips indicated that he was not really worried about any pending proceedings on the charges. According to Phillips' confession, Mocaby testified, this woman was abducted near a parking lot behind Gatsby's (a restaurant and bar) in Carbondale and taken to an office at his father's business on Route 51. The automobile used for the abduction was the victim's own car. Phillips also told Mocaby that, because the victim's car was low on gas, he put some gasoline into the tank while at his father's business before taking the victim into the office. During the abduction, the defendant told Mocaby, the victim was passive and cooperative; she did not fight or put up a struggle as Phillips raped her, had oral sex with her and attempted to force her to have oral sex with him. According to the testimony, Phillips also asked Mocaby, while they were cellmates, to put a tattoo on his chest. The tattoo, Phillips had indicated, would support his assertion that he did not commit the rape because if he were the rapist, the victim would have noticed the tattoo. Mocaby, however, never gave Phillips the tattoo.

Christina Kater also testified at the trial. She testified that on the evening of December 26, 1981, she had gone to a friend's house to borrow a car in order to go to a movie. The friend's house was located in Carbondale on South University, behind Gatsby's. The car she was borrowing was parked in a parking lot that was behind the house, that is, between the house and Gatsby's. As she opened the door to the car she was pushed into the car and the rapist grabbed her while holding a knife to her neck. He then pushed her into the passenger side

and started driving the car himself. During this initial scuffle, Kater's glasses were knocked off and her purse disappeared. The assailant drove for a time and then stopped the car. While stopped, Kater indicated, she was told to take off her coat, her hands were then tied behind her back with a thin rope, a piece of cloth which came down to her neck was put over her head, and the rope was tied around her neck to hold the cloth onto her head. She was also told to scoot down on the seat so that she would be out of sight. The assailant again began to drive the car but shortly thereafter stopped and got out. While he was out of the car, Kater attempted to untie her hands in order to escape, but he noticed her efforts; he hit the windshield, got back into the car, and tied her hands again. Kater indicated that her abductor was angry. He proceeded to drive for a short time and then stopped again and got out of the car. Kater again attempted to untie her hands but was again noticed. The abductor got back into the car for a few seconds; he then got out and went to open the trunk of the car where he placed Kater. He drove again for a very short time and finally stopped. He took Kater out of the trunk and, she testified, she walked over some gravel before they entered a building.

Once in the building, they went into a room in the building, the door of which the rapist closed and locked. She was then told to take off all of her clothes; the cloth was then removed from her head. The room was dark. The rapist proceeded to kiss and caress her; he then forced his penis into her mouth and then he raped her. Kater indicated that her participation in these activities was not voluntary but that she did not fight the rapist because he had a knife; she feared that if she did not cooperate he would kill her. After the rape, Kater was told to put her clothes back on, which she did; the cloth was again put over her head and her hands were tied behind

her back. They left the building and her abductor attempted to put Kater back into the trunk. When she refused, he told her she could ride in the car. He then began to drive the car and, as they drove, Kater was allowed to remove the cloth covering her face. Although at that exact point in time it was still very dark and she could not see his face, as he continued to drive they passed through well-lit areas and Kater was then able to see his face.

Although Kater wears glasses, she indicated during testimony that she is nearsighted, that is, she can see things near to her clearly. At the time that she saw her abductor's face, she knew exactly where they were; they were on Walnut Street in Carbondale heading towards South University Street. These streets are major thoroughfares in Carbondale and are well lit. During this time the rapist talked with Kater and told her that he was taking her back to where he first saw her. When they arrived in the parking lot, he untied her hands and left her in the car. She did not see where he went; instead, she started the car and drove it around to the front of her friend's house and went in.

Kater testified that she told her friends what happened but that at first her friends were angry with her for not screaming and fighting the rapist. At this point, Kater indicated, she felt that everyone would have the same reaction, that they would also yell at her or be angry with her for not fighting. The police were called and while they were waiting for an officer to arrive, Kater and one of her friends went to the car to see if they could find Kater's glasses. While searching the car for the glasses and purse they noticed that the auto, which had originally had very little gas in it when Kater went to get in the car, now had a full tank. When the police officer arrived, Kater was taken to the local hospital where she was examined by a doctor who also took sam-

ples using a rape kit for evidentiary purposes. Later that same evening Kater attempted to recreate for the police officer the events of the evening before accompanying the officer to the station where she completed a written report.

In her initial report to the police, Kater indicated that she had not seen the rapist. She testified during trial that she initially told this story because she was very afraid that she would get the same reaction from the police that she had received from her friends, that she would be yelled at for not fighting her abductor. However, within a few days, by December 31, she indicated that she rethought her position, realized that not everyone would react the same way, and therefore told the police the truth, that is, that she had indeed seen the assailant and could identify him. She assisted an officer in the preparation of a composite drawing which she felt showed a likeness of the rapist.

Police subsequently showed her photographs from which she identified the rapist. As we have already discussed, this identification preceded the time during which Phillips and Mocaby shared a cell. At the Weatherall trial Kater identified the defendant as the person who had raped her. The defendant, at the time of the Weatherall trial, was still awaiting trial on the Kater rape charges. Kater's testimony was subject to vigorous and thorough cross-examination at the Weatherall trial; in addition, we note that the defendant's attorney who was representing him in the Kater proceedings against the rape charges was required to be present during the entire Weatherall trial. The court indicated that this was for the very purpose of assisting the Weatherall defense attorney and protecting the interests of the defendant as to any testimony or information about the Kater rape which might be elicited during the Weatherall trial.

Admission of the testimony regarding the Kater case was subject to extensive briefing and oral argument prior to the trial court's decision to allow the testimony. In reviewing the similarities which the State asserted were an indication of a common scheme, intent, or design of *modus operandi*, the court recognized 10 factors which supported a finding of common scheme: both victims were abducted from downtown Carbondale; the points of abduction were just three blocks away from each other; the crimes occurred just 46 days apart; both women were about the same age; both women were abducted after dark; both women were placed in the trunk of the car during the abduction; force was used against both women and each had had her hands tied; both women were taken to the industrial park where the defendant's father maintained his place of business; both women were raped and subjected to deviate sexual assault; and both incidents occurred over a holiday period when the particular business location used for the perpetration of the crimes would be empty.

Defendant contends that the Kater testimony should have been disallowed because the two crimes were totally dissimilar and only served to improperly prejudice the jury with a showing that the defendant had a propensity to commit crimes. The most obvious difference, defendant asserts, is the fact that in this (Weatherall) case the woman was violently and brutally killed while in the Kater case the victim was treated "in a totally nonviolent manner." While it is apparent from Kater's own description that she did not have lacerations to the head, a chipped skull, a black eye or swollen lips following the rape, it is inconceivable how the mere absence of such injuries transforms an alleged crime of rape into a "nonviolent" activity. Nor do we find persuasive defendant's arguments that other differences are indeed substantial differences that are determinative, *i.e.*, the use of the

victim's car as opposed to the use of his wife's car; the difference between a 7 p.m. abduction and a 1:30 a.m. abduction; the return of the victim to the spot where abducted as opposed to being dumped in the strip pit; the difference between being choked unconscious and having the head covered with cloth; the difference in timing as to when the victim's hands were tied (before or after the rape); the difference between an alleyway and a parking lot.

We also find unpersuasive defendant's argument that the testimony obviously should not have been allowed because the jury did not subsequently find the defendant guilty of felony murder during the commission of rape and deviate sexual assault. The admittance of testimony is not judged in hindsight based on the jury's final verdict, but rather on its relevance. *People v. McKibbins* (1983), 96 Ill. 2d 176, 182.

This court has long held that evidence which tends to prove a fact in issue is admissible even though it may be evidence showing that the accused has committed a crime other than the one for which he is being tried, and evidence which shows motive, intent, identity, or *modus operandi* is admissible despite the fact that it may show the commission of another crime. (*People v. Lehman* (1955), 5 Ill. 2d 337, 343; *People v. McDonald* (1975), 62 Ill. 2d 448, 455; *People v. McKibbins* (1983), 96 Ill. 2d 176, 182.) Evidence of other offenses has been upheld as admissible if it is relevant for any purpose other than to show the propensity to commit crimes. (*McKibbins*, 96 Ill. 2d at 182; *McDonald*, 62 Ill. 2d at 455; *People v. Dewey* (1969), 42 Ill. 2d 148, 157.) The threshold question of whether a crime occurred in which the defendant participated (*Wernowsky v. Economy Fire & Casualty Co.* (1985), 106 Ill. 2d 49, 55) has been answered in the affirmative. While similarity is essential to admittance of the disputed evidence, the test is not one of exact, rigor-

ous identity. This court has recognized that "some dissimilarity will always exist between independent crimes." *People v. Taylor* (1984), 101 Ill. 2d 508, 521.

The defendant's reliance on *People v. Tate* (1981), 87 Ill. 2d 134, is not persuasive. *Tate* is often cited for the proposition that evidence of other crimes as proof of *modus operandi* is only admissible upon a "strong and persuasive showing of similarity." (87 Ill. 2d at 141.) While that proposition is not contested, defendant goes on to assert that we are also bound by this court's statement in that case that "there must be present some distinctive features that are not common to most offenses of that type in order to demonstrate *modus operandi*." (87 Ill. 2d at 143.) Defendant asserts that the Weatherall and Kater cases do not have such "distinctive features" which distinguish it from other offenses of this type. *Tate*, however, in discussing the distinctive features argument, was concerned with admitting evidence of another person's commission of a crime in order to support the defendant's contention that he did not commit the crime for which he was charged.

In *Tate* evidence was presented that the defendant had entered a grocery store, walked to the meat counter and was observed putting items in his coat by the store's security guard. When the security guard confronted him and told him that he was under arrest, he attempted to head back to the meat counter. The security guard grabbed him, however, and began to frisk him. The defendant then dropped the meat and a struggle ensued. During the struggle the defendant grabbed the guard's gun; he then went to the front of the store where he attempted to break the lock on the door which the cashiers had secured. When the attempt failed, the defendant ran to the back of the store and fled through the back door. At trial, the guard and two cashiers identified the defendant as the man involved in the robbery. The evi-

dence which the defendant asserted should have been provided to him was the arrest report of an offense committed by James Brown. The report indicated that Brown had tried to steal meat and that when a police officer who had been called to the scene followed him out of the store he threw the meat to the ground and ran. The officer ran after Brown, tackled him to the ground, and during the struggle Brown tried to grab the officer's gun. The court concluded that the stealing of meat by hiding it in or under a coat, fleeing from an officer, and reaching for an officer's gun during a struggle did not amount to distinctive features which would mark the offenses as the work of a single perpetrator.

The case before this court presents a quite different scenario than that confronted by our court in *Tate*. While our court saw the events described in *Tate* as nondistinctive and capable of being found in many shoplifting and struggle cases, it was also noted that distinctive links could be found with evidence which indicated that a defendant was "using similar weapons, dressing the same, acting with the same number of people, or even [using] a distinctive method of committing this particular offense." (87 Ill. 2d at 142.) This listing of links was not meant to be all-inclusive or limiting on the trial court's weighing and balancing of similarities and dissimilarities.

As noted above, the trial court found 10 distinct areas of similarities between the Weatherall and Kater abductions. On review of the record, we find that the similarities were sufficient to warrant admission of testimony regarding the Kater offense in the Weatherall trial. The mere presence of some dissimilarities does not catapult the testimony into a "clear abuse of discretion" category necessary on review to warrant reversal of the trial court's decision.

Defendant's third argument claims that he was denied a fair trial based on the prosecutor's improper

statements made during the closing argument. The allegedly improper statements involved (1) a prosecutorial remark accusing the defense case of being a fraud, (2) an attempt to shift the burden of proof to the defendant, and (3) an obfuscation of the meaning of reasonable doubt.

The first argument, alleging improper statements based on an accusation of fraud, involves two statements made by the prosecutor. In discussing certain defense witnesses—Kirkpatrick, Kane and Manna—and their reliability or credibility, the prosecutor indicated that "it is the weaknesses that expose this defense as nothing more than a fraud. It is nothing more than a type of trickery ***." Defense counsel objected to the statement; the court sustained the objection and instructed the jury to "disregard fraud and trickery." Later in the closing argument, when discussing evidence about the presence of dogs on the Phillips property and defendant's concern that Kater never indicated that she heard the barking of dogs and thus she could not have been on that property, the prosecutor pointed to testimony by the defendant's former wife. In that testimony, the defendant's former wife indicated that the defendant had been hunting earlier on the day of the Kater abduction. The prosecution speculated that because of the hunting trip perhaps the dogs were not even on the property. In referring to the defendant's concern about barking dogs, the prosecutor went on to say: "It is all part of a shotgun defense. Throw that out and see what sticks. It is nothing more than a red herring intended to distract you from the real issues in this case." The State argues that defense attorneys did not object to this statement during the closing argument, thus any alleged error is waived. (*People v. Adams* (1985), 109 Ill. 2d 102, 118; *People v. Gacy* (1984), 103 Ill. 2d 1, 88.) Additionally, the State argues, neither statement was raised in the defendant's motion

for a new trial, thereby waiving consideration on appeal. *People v. Jones* (1988), 123 Ill. 2d 387, 410; *People v. Enoch* (1988), 122 Ill. 2d 176, 190.

Defendant urges the court to consider the argument, however, under our plain error rule (107 Ill. 2d R. 615(a)). As this court has stated in the past, though, in order for the statements to be considered plain error they must be either "so inflammatory that defendant could not have received a fair trial or so flagrant as to threaten deterioration of the judicial process." (*People v. Albanese* (1984), 104 Ill. 2d 504, 518.) Neither comment by the prosecutor reaches such level so as to be construed as inflammatory or a flagrant threat to the judicial process. In reviewing specific statements made in the closing arguments we must look to more than just a few words in isolation; we must look to the entire context in which the words were uttered. Often, the same word may have a completely different impact on a listener, depending on the particular circumstances. For example, one has only to think of the word "fire" yelled in a crowded theatre when there is no danger present as opposed to the yell which warns those truly endangered.

Defendant likens the prosecutor's statements here to those made in cases such as *People v. Emerson* (1983), 97 Ill. 2d 487, and *People v. Monroe* (1977), 66 Ill. 2d 317, where this court sent the cases back for a new trial based on improper prosecutorial statements. These cases are, however, distinguishable; the comments therein were of an eminently more egregious nature.

In *Emerson* the prosecutor, in closing argument, stated that the defense counsel had laid down a smokescreen of lies, misrepresentations, and innuendoes. Additionally, he said that "all defense attorneys" attempt to "dirty up the victim" in order to distract the jury from the defendant's actions. In discussing these two occurrences, this court noted that it was not clear whether

the remarks about lying and misrepresentations were aimed directly at defense attorneys or whether it was meant to suggest that the defense presented consisted of testimony which was composed of lies and misrepresentations. We noted, however, that remarks about "all defense attorneys" tended to "shift the focus of attention from the evidence in the case to the objectives of trial counsel." (97 Ill. 2d at 498.) This court concluded that "argument which, in effect, purports to charge counsel with fabrication of a defense bordering on subornation of perjury" (97 Ill. 2d at 499) is beyond the scope of allowable comment.

Within the context of the closing argument in the case before us, the prosecutor's comments were not an attempt to impugn the defense counsel, but were, rather, either allowable references to relevance and credibility or were disallowed when the defense objection was sustained.

*Monroe* also involved facts much more egregious than those before us now. In *Monroe*, not only did the prosecutor express his own opinion as to the defendant's guilt, characterize the defendant's closing argument as fraudulent, and accuse defense counsel of "character assassination" of the prosecution witnesses, but he also stated that the defense was "preposterous" and not even believed by defense counsel himself. Here again the statements were more in the nature of a personal attack between the attorneys involved in the litigation, for the trial court noted that " '[a]ll through this case we have been trying the lawyers rather than the issues in this case.' " (*Monroe*, 66 Ill. 2d at 323.) The prosecutor's statements herein do not sink to such a level as found in *Monroe* so as to unfairly antagonize the jury against the defendant's trial strategy and argument.

Defendant next claims that two statements made by the prosecutor during closing argument improperly

shifted the burden of proof to the defendant. The first comment raised was the statement by the prosecutor after reviewing the defendant's theory of the case that "[i]f they had a good defense couldn't they come up with something better than that?" No objection was made to this statement at trial. Although the issue of burden shifting was included in the motion for a new trial, we note that because the defendant did not object to this statement at trial, he has waived it on review. (*People v. Adams* (1985), 109 Ill. 2d 102, 118.) However, even were it not waived, we note that the statement, in context, was permissible comment on evidence introduced at the trial. During rebuttal to the defense's closing, the prosecutor discussed the defense contention that Weatherall had been tied up and killed at a location on Dogwood Lane where ropes and a matchbook from Dumarocs had been found. The prosecutor noted:

"To suggest, to suggest, that the marks on her hands are somehow related to how she was tied up to that tree in Dogwood Lane really points out the weakness of this defense. If they had a good defense, couldn't they have come up with something better than that? That shows how weak it is."

An attack on a particular theory of defense, such as is found within the context of this disputed statement, did not unfairly prejudice defendant or indicate an improper shift of the burden of proof. *People v. Adams* (1985), 109 Ill. 2d 102, 118.

The second comment also followed a review of defense testimony:

"If you examine the evidence of Kirkpatrick, Manna and Kane and the type of defense they presented does it raise a reasonable doubt? No. It does just the opposite. It establishes even further the fact that he is guilty of the murder of Joan Weatherall. If they had anything better they would have put it on."

Review was preserved by objection at trial and inclusion in defendant's motion for a new trial.

As defendant noted, this court has long held that it is impermissible for the prosecution to attempt to shift the burden of proof to the defense. (*People v. Weinstein* (1966), 35 Ill. 2d 467, 470.) Indeed, the defense is under no obligation to present any evidence; "the prosecution has the burden of proving beyond a reasonable doubt all the material and essential facts constituting the crime." (35 Ill. 2d at 470.) This court has never said or implied, however, that once a defendant does present certain evidence it is beyond the reach of appropriate comment by the prosecution. There is a great deal of difference between an allegation by the prosecution that defendant did not prove himself innocent and statements questioning the relevance or credibility of a defendant's case. (See *People v. Adams* (1985), 109 Ill. 2d 102, 120-21; *People v. Albanese* (1984), 104 Ill. 2d 504, 521-22.) Not every prosecutorial statement questioning relevance or credibility rises to an impermissible shifting of the burden. While the defendant argues that *Weinstein* is applicable to this case, we do not find that a single reference, one that is arguably a reference to the testimony offered, can be equated with the repeated assertions in *Weinstein* that the defense had the burden to produce evidence which would create a reasonable doubt.

Defendant's last concern about statements made in the closing argument relates to the prosecution's characterization of "reasonable doubt" and the standard of proof. During closing arguments the prosecutor made the following statements:

> "Now, the proof in this case, of course, the standard is, of course, proof beyond a reasonable doubt. This is the same standard, the same burden that is applicable in all criminal cases.
>
> [Objection by defense overruled.]

Okay, it is the same standard, ladies and gentlemen, that is applicable in all criminal cases. Every criminal case that is tried in this courtroom, in this county, in this state and in this country in any type of criminal case.

[Objection by defense sustained.]

Ladies and gentlemen, suffice it to say it is not proof beyond all doubt, it is not proof beyond any doubt, it is proof beyond a reasonable doubt."

Defendant alleges that this is an impermissible attempt to minimize the State's burden and likens the language to that found impermissible in *People v. Starks* (1983), 116 Ill. App. 3d 384.

*Starks*, however, which indicated that the State could not reduce its burden of proof to a *pro forma* or minor detail, was an egregious example of impermissible language. The prosecutor in that case told the jury that "there's nothing special going on here and we don't have a burden, no matter what [the defense attorney] would like you to think \*\*\*." (116 Ill. App. 3d at 395.) The court in *Starks* distinguished the language found therein with the language which this court found permissible in *People v. Bryant* (1983), 94 Ill. 2d 514. The disputed language in *Bryant* characterized the State's burden of proof as "not unreasonable" and "met each and every day in courts." (94 Ill. 2d at 523.) This court noted in *Bryant* that prosecutors are precluded from engaging in "inflammatory and unfounded closing arguments." (94 Ill. 2d at 523.) The prosecution's allegations in *Starks* that the State did not have any burden is such an "unfounded" argument; the prosecution's arguments in this case do not cross the "boundary of propriety" (*Starks*, 116 Ill. App. 3d at 395) that was found in *Starks*.

Finally, defendant contends that the combination of these allegedly improper statements so infected the trial with unfairness that, under the fourteenth amendment, he was denied due process. Defendant's reliance on *Don-*

*nelly v. DeChristoforo* (1974), 416 U.S. 637, 40 L. Ed. 2d 431, 94 S. Ct. 1868, upon a full reading of the case, is misplaced. The *Donnelly* Court found that the prosecutor's comments during closing arguments, comments objected to by defense counsel and sustained by the court, were not egregious enough so as to amount to a denial of constitutional due process, especially where the jury was properly instructed to disregard the statement. The comment under consideration in *Donnelly* was the prosecutor's statement that "they [the defendant and his counsel] hope that you find him not guilty. I quite frankly think that they hope that you find him guilty of something a little less than first-degree murder." (416 U.S. at 640, 40 L. Ed. 2d at 435, 94 S. Ct. at 1870.) The Court distinguished such a statement from those which can be classified as consistent and repeated misrepresentations and noted that:

> "[i]solated passages of a prosecutor's argument, billed in advance to the jury as a matter of opinion not of evidence, do not reach the same proportions. Such arguments, like all closing arguments of counsel, are seldom carefully constructed *in toto* before the event; improvisation frequently results in syntax left imperfect and meaning less than crystal clear. While these general observations in no way justify prosecutorial misconduct, they do suggest that a court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations." (416 U.S. at 646-47, 40 L. Ed. 2d at 438-39, 94 S. Ct. at 1873.)

The prosecutor's comments here called into question either were properly objected to with adequate instruction from the court or do not reach the level of improper argument requiring a reversal of the defendant's conviction.

Defendant's fourth issue asserts that he was denied a fair trial because of the prosecutor's allegedly harassing and misleading cross-examination of a defense expert. The defense expert, Louis Vitullo, was presented to the jury as a contributor to, among other works, "Scientific Evidence in Criminal Cases, all three volumes." Vitullo also testified that he had travelled to Carbondale in order to examine evidence in the lab and that he had submitted a bill for this work. The cross-examination here in question centered on these two points of testimony.

During cross, the prosecution questioned the extent of Vitullo's contribution to the scientific evidence volume, based on the fact that Vitullo was not listed as a contributor in the preface of the third volume of the work. Additionally, Vitullo was questioned regarding the bill he submitted for eight hours of work in Carbondale, based on his courtroom testimony that he had only worked at the lab examining the evidence for four hours.

Defendant urges that the impropriety of these lines of questioning of the witness are similar to, and governed by, *People v. Nuccio* (1969), 43 Ill. 2d 375. In *Nuccio* this court found that the line of questioning pursued by the prosecution was improper and "predicated upon a persistent course of cross-examination by which the State repeatedly insinuated, generally without any supporting testimony, that defendant and his witnesses had engaged in a pattern of reprehensible conduct in their relationships to the youths who frequented Franksville." (43 Ill. 2d at 381.) The impropriety, this court found, did "not rest simply upon unsupported insinuations of misconduct, but also upon the State's failure to present appropriate rebuttal testimony in response to the defense witnesses' specific denials of misconduct." 43 Ill. 2d at 381.

The prosecutorial conduct in *Nuccio* is decidedly distinguishable from the activity involved in this case.

While the prosecutor in *Nuccio* asked questions which could have led the jury to believe that the defendant and his friends engaged in repeated confrontational actions but then failed to support the insinuations with clarifying or corroborative testimony, the prosecutor in this case merely sought to clarify the expert's credentials and billing methods, both legitimate areas of cross-examination. Having reviewed the record we find none of the inflammatory and accusatory language and approach which we have found in the past to be improper. See, *e.g.*, *People v. Lyles* (1985), 106 Ill. 2d 373, 402 (finding that the prosecutor's remarks "were improper and inflammatory and constituted nothing less than character assassination").

The adversarial process of cross-examination may at times offend the sensibilities of the uninitiated; indeed, the savvy attorney might well tend to avoid being classified as a bully by the jury he is trying to influence if confronted by an inexperienced or shy witness. Vitullo, however, does not fall among the uninitiated; he is an experienced forensic scientist, an expert who has testified at numerous trials. This is not to indicate that those experienced at testifying must subject themselves to a ruthless cross-examination, but rather to support the inference that, once Vitullo indicated that he had contributed to all three volumes of one book or testified that he examined the evidence for four hours when the bill appeared to show a charge for eight hours, he would know that he would be questioned by the opposition, who might have information indicating that the statements might not be quite accurate. Such questioning is not automatically elevated to harassing or humiliating merely because it may be perceived by others as difficult when it seeks to clarify a point that the proponent would rather not have elucidated. (See *Muscarello v. Peterson* (1960), 20 Ill. 2d 548 (where this court noted that great

latitude is allowed in cross-examination in order to achieve the well-recognized purpose of showing those matters which affect the credibility of the witness).) We conclude that the defendant was not denied a fair trial by the legitimate, albeit vigorous, cross-examination of the witness.

For the foregoing reasons we find that there was no error in the trial proceedings and therefore affirm the defendant's convictions.

## SENTENCING HEARING

We turn next to alleged defects asserted to have occurred at the sentencing phase of defendant's trial. Defendant first contends that he was denied a fair and reliable sentencing hearing when the court failed to consider unrebutted evidence which showed that the defendant was suffering from an extreme mental or emotional disturbance at the time of the offense. We find this argument without merit.

At the sentencing hearing, defendant presented Dr. Gordon Plumb, a clinical psychologist, who testified regarding his examination of and interviews with the defendant in the spring of 1982. Based on his interviews, tests administered, and review of reports by other psychiatrists who had examined and counseled the defendant, Dr. Plumb testified that it was his opinion that in addition to having an antisocial disorder, the defendant was, during the month of November 1981, suffering from an extreme mental or emotional disturbance. Dr. Plumb based his conclusion upon evidence of the defendant's subjection to sexual abuse at the hands of his mentally ill mother during his early youth. The abuse led the defendant, Dr. Plumb testified, to have a "compulsive and irresistible urge to hurt women."

Defendant alleges that this evidence is unrebutted and that, additionally, the court misconstrued the defini-

tion of "extreme mental or emotional disturbance" and "completely ignore[d] and discount[ed] the mitigating evidence." It is certainly not clear from the record that Dr. Plumb's testimony is "unrebutted," for we note not only that he was subject to rigorous cross-examination which called into question his conclusions, but that the entire trial record was admitted as grist for the sentencer's consideration. At trial, other psychiatric personnel had testified as to their conclusions about the defendant after their own interviews and examinations. While others had found that the defendant did suffer from an antisocial disorder, no other testimony had been offered which would indicate that the defendant was suffering from an extreme mental or emotional disturbance. The trial court could properly weigh Dr. Plumb's testimony under both direct examination and cross-examination and against other expert testimony offered at the trial.

Defendant also alleges that the court misconstrued the necessary components of an extreme mental or emotional disturbance by indicating that such a disturbance cannot be found where there is deliberate, methodical action. At the sentencing hearing, the court made the following statement:

> "The next step is the factors in mitigation. I will specifically address the question about the defendant being under the extreme mental or emotional stress. The evidence at trial is contrary to Dr. Plumb's testimony. The testimony and evidence at trial indicates a deliberate, methodical plan on behalf of the defendant during the month *** when this offense was committed ***. The court is obligated to conduct a balancing test as to the factors in mitigation and that's the standard by which we make the decision."

We do not read the court's statement as narrowly as the defendant would have us do. This was an oral statement, not a written decision in which every single word might

be pondered; the court clearly indicated that the trial testimony was considered and compared with that of Dr. Plumb; the court concluded that Dr. Plumb's testimony was found wanting. Mere reference to a methodical plan will not negate the court's finding.

We note that defendant's reliance on *People v. Carlson* (1980), 79 Ill. 2d 564, is misplaced. While it cannot be said that the actions of the defendant in *Carlson* were devoid of deliberation or planning, the defendant misses the larger picture of that case in attempting to use it to support a contention that a person acting under emotional duress may also act methodically. The emotional disturbance in that case was much closer to a triggering event; the rejection that the defendant had experienced and the collapse of his hopes for a reunion with his estranged wife were indeed very recent in time. Carlson was, our court concluded, traumatized by his own recent actions in taking the life of his former wife. *Carlson*, 79 Ill. 2d at 569-75, 590.

We are not here confronted with such a recent emotional trauma. While it is clear from the record that the defendant did indeed have difficult experiences in his childhood, it is also clear that he had the long-standing love and affection of a father and a sister, and that he had the benefit of untold hours of psychiatric care and counseling to assist with overcoming these childhood problems. Additionally, we note that defense can point to no event somewhat contemporaneous with the murder that could have inflamed the defendant's emotional stance to such a fragile point as to leave him with little to no emotional control. It is conceivable, indeed probable as we read the record, that the court spoke of method and deliberation not in terms of the isolated actions necessary to carry out this crime, but in an overall reference to the nature of the defendant's mental state. He was not acting or reacting to an extreme emo-

tional stress triggered by something or someone outside of his control; he was instead deliberately choosing to involve himself in the kidnapping and murder of an individual with whom he had no prior contact and who had not in any way initiated a hostile encounter. As our court previously indicated in *People v. Brownell* (1980), 79 Ill. 2d 508, 539-40, we will not lightly overturn a trial court's finding as it relates to the emotional condition of the defendant.

We also briefly note that the court did not, as defendant alleges, discount and ignore the evidence in mitigation. As the trial court's quoted statement above clearly notes, the court did weigh the testimony. This case is not similar to *Eddings v. Oklahoma* (1982), 455 U.S. 104, 71 L. Ed. 2d 1, 102 S. Ct. 869, a case in which the trial court had refused as a matter of law to consider a fact in mitigation. However, in that case the Supreme Court went on to note that "[t]he sentencer *** may determine the weight to be given relevant mitigating evidence. But they may not give it no weight by excluding such evidence from their consideration." (455 U.S. at 114-15, 71 L. Ed. 2d at 11, 102 S. Ct. at 876-77.) The trial court properly considered the factor in mitigation; consideration does not, however, require the court to rule in the defendant's favor.

Defendant next contends that irrelevant and prejudicial victim impact statements and testimony were considered in imposing the death sentence. Defendant relies on *Booth v. Maryland* (1987), 482 U.S. 496, 96 L. Ed. 2d 440, 107 S. Ct. 2529, for the proposition that any victim impact statement at a death penalty sentencing hearing violates the eighth and fourteenth amendments of the United States Constitution. *Booth* involved a lengthy and emotional victim impact statement that was read to the jury at the sentencing portion of the hearing, the greater portion of which was devoted to a description of

the emotional trauma suffered by the family, as well as personal characteristics of the victims. The Court found that inclusion of such information was "inconsistent with the reasoned decisionmaking we require in capital cases." 482 U.S. at 509, 96 L. Ed. 2d at 452, 107 S. Ct. at 2536.

In the case before us, the defendant first objects to statements made by two sisters of the victim; the paraphrased statements are found in the presentence investigation report. Defendant did not object to the admission of the presentence report at the hearing, nor did he object in the motion for a new trial. Defendant also objects to the testimony of two other individuals at the hearing, family members of victims of other crimes not involved in this case. However, because the court specifically indicated that testimony about the two uncharged crimes was not considered in reaching a decision about the sentence, we need not deal with that testimony here. We turn now to consideration of the victim's sisters' statements found in the presentence report.

The State argues that because defendant did not object to the presentence report at trial or raise an objection to it in the motion for a new trial, the argument is now waived on appeal. Our court has found in the past, though, that the admission of victim impact statements may involve plain error and therefore may be reviewed. (*People v. Simms* (1988), 121 Ill. 2d 259, 272.) While *Simms* is distinguishable on several levels from the case before us, it clearly supports the relaxation of the waiver rule "where fundamental constitutional rights are at stake." 121 Ill. 2d at 272.

To begin our analysis of this issue, we note that the statements of the sisters consisted of just slightly over a page of paraphrased material in a 12-page presentence report. While we do not agree with defendant that the statements are just as inflammatory as those found in

*Booth*, because we reach our decision that the admittance of the material does not warrant a new sentencing hearing on other grounds, we will not engage in a detailed analysis comparing and contrasting the statements found in *Booth* with those here. However, even were we to engage in a detailed analysis, the statements included in the presentence report are much closer in tenor to those reviewed in *People v. Jones* (1988), 123 Ill. 2d 387, 424-25, where this court found no error in admission of the impact statements.

It is not necessary to our review, however, to so analyze the written statements, because our court has often held that when the trial court acts as the sentencer, it will be presumed to have considered only competent and reliable evidence. (*People v. Whitehead* (1987), 116 Ill. 2d 425, 455; *People v. Hall* (1986), 114 Ill. 2d 376, 419; *People v. Harris* (1974), 57 Ill. 2d 228, 231; *People v. Wallenberg* (1962), 24 Ill. 2d 350, 354.) There is nothing in the record to rebut the presumption that the court considered only competent evidence in sentencing the defendant to death; absent an express indication that improperly admitted material was considered (see *People v. Simms* (1988), 121 Ill. 2d 259, 274), we will not take the step that defendant suggests and presume that it was considered. Moreover, we note from the judge's statement at sentencing that, while he enumerated several factors that he considered in reaching his decision to impose the death sentence, at no point did he indicate that the sisters' statements influenced his decision. Accordingly, we find that even if the admittance of the statements was in error, it was not harmful based on the presumption that the trial court considered only relevant and competent evidence in reaching a decision.

Because we reach our decision on this issue on the basis noted above, we need not consider defendant's alternative allegation that he was denied effective assist-

ance of counsel based on the failure to object to the admittance of the evidence. Defendant was not prejudiced by the admission of the statements, a requirement necessary under the two-pronged *Strickland* test. *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052.

The defendant next contends that his sentence of death was the result of an impermissible double enhancement and that absent this enhancement he would not be eligible for the death penalty. The defendant was found eligible for the death penalty based on his conviction for murder in the course of the felony of aggravated kidnapping (Ill. Rev. Stat. 1981, ch. 38, par. 9—1(c)). The defendant alleges that the acts which formed the basis for the murder charge were the very same acts which already had enhanced the crime of kidnapping to aggravated kidnapping. It was then, defendant contends, the crime of aggravated kidnapping which was used in conjunction with the murder charge to make him eligible for the death penalty. Because defendant contends that this is an impermissible double enhancement, he concludes that his sentence must be reversed. The State argues that we need not even consider this issue based on defendant's failure to raise the objection in his post-trial motion, thereby waiving it. Defendant counters by asserting that we should consider the argument under the plain error doctrine.

Defendant cites *People v. Adams* (1985), 109 Ill. 2d 102, to support his assertion of plain error. In *Adams* this court vacated the death sentence imposed on the defendant based on the fact that the jury was presented with an aggravating factor that was nonexistent. In that case the prosecution had attempted to argue that the victim had been a witness to her own murder and that therefore section 9—1(b)(8) (Ill. Rev. Stat. 1981, ch. 38, par. 9—1(b)(8)) applied as an aggravating factor, as did

another section which this court found correctly applied. Because it was not possible to determine to what extent the nonexistent aggravating factor influenced the jury's decision, we determined that, even absent proper objection, we would recognize the presentation of the aggravating factor as plain error. (*Adams*, 109 Ill. 2d at 128.) Were the presentation of a single aggravating factor erroneous, therefore, the defendant asserts that under the plain error doctrine his sentence should also be vacated.

We therefore examine defendant's contention that the death sentence was imposed based on an erroneous aggravating factor, that is, based on an impermissible double enhancement. It is clear that, under section 9—1(b)(6)(c), a defendant may be sentenced to death if "the murdered individual was killed in the course of another felony if: (c) the other felony was one of the following: *** aggravated kidnapping ***." (Ill. Rev. Stat. 1981, ch. 38, par. 9—1(b)(6)(c).) The defendant here argues, in essence, that the only way that the court could find that an aggravated kidnapping occurred was to use the same facts which allowed the court to find that a murder occurred; because, defendant asserts, the same facts cannot be used more than once, the court could find the defendant guilty of murder, but not of murder during the commission of the felony of aggravated kidnapping. Although novel, the argument is not properly applied in this case.

Aggravated kidnapping will be found when the kidnapper "[i]nflicts great bodily harm *** upon his victim." (Ill. Rev. Stat. 1981, ch. 38, par. 10—2(a)(3).) A finding of murder is based on an intention to "kill or do great bodily harm to that individual or another, or know[ing] that such acts will cause death to that individual or another." (Ill. Rev. Stat. 1981, ch. 38, par. 9—1(a)(1).) In this case, the autopsy report indicated that the cause of death was strangulation. A secondary cause was sug-

gested, exsanguination, or loss of blood, from the blows to the head. We note from the record, however, that a finding of aggravated kidnapping would be warranted without using either of the noted injuries that led to Weatherall's death. For instance, the record indicates that at the point of abduction Weatherall was choked unconscious and put into the trunk, that she suffered contusions and abrasions on her face and body, that her wrists showed the marks of having been tied, and that her knee showed additional signs of physical injury. Each of these, without reference to the final strangulation or wounds found on her skull or the chipped skull, would have been enough to support the finding of murder during the commission of an aggravated kidnapping.

That the use of the words "great bodily harm" in each statutory section regarding murder and aggravated kidnapping reduces the court's finding to an impermissible double enhancement is a meritless argument. Defendant misreads and misapplies this court's rationale in the cases upon which he relies. In *People v. Hobbs* (1981), 86 Ill. 2d 242, this court vacated an extended term sentence imposed when the defendant's recent misdemeanor charge was elevated to a felony based upon a prior conviction. The extended term was imposed based on a statute which allowed the court to do so when the defendant had separate felony convictions within 10 years (see Ill. Rev. Stat. 1979, ch. 38, par. 1005—5—3.2(b)(1)). This court found that the second action could not both be elevated from a misdemeanor to a felony and be cause for an extended term. This court noted, however, that an "extended term would have been permissible here, if, for example, the value of the liquor taken *** exceeded $150 so as to make its taking a felony." (*Hobbs*, 86 Ill. 2d at 245.) As we noted above, the record would support a finding of aggravated kidnapping without utilization of those acts which caused death. We are not here con-

fronted with a situation in which a single solitary act constituted both the sole action causing death and the single activity which raised a kidnapping to aggravated kidnapping and therefore offer no comment upon application of the death penalty in such a circumstance.

*People v. Haron* (1981), 85 Ill. 2d 261, is equally distinguishable from this case. In *Haron,* this court affirmed the dismissal of an armed violence count against the defendant based upon a double enhancement review. This court stated that based upon review of the statute in question and the legislative intent, there could not be a finding that "the presence of a weapon serve to enhance an offense from misdemeanor to felony and also to serve as the basis for a charge of armed violence." (*Haron,* 85 Ill. 2d at 278.) Again, in the case now before us, unlike *Haron,* we are not confronted with a single factor which was applied in two different circumstances to the detriment of the defendant.

Additionally, we note that the result under this analysis is in accord with our decision in *People v. Eddmonds* (1984), 101 Ill. 2d 44, wherein this court noted that the "apparent rationale of making the death penalty applicable to a murder during the commission of another felony [citation] is to deter further acts of violence during the commission of those felonies." (101 Ill. 2d at 67.) Accordingly, we find that the imposition of the death penalty was not under an impermissible double enhancement and we therefore decline to vacate the court's order.

## CONSTITUTIONAL ISSUES

Defendant also raises several constitutional issues which have been previously argued and rejected by this court in other cases. We decline defendant's invitation to review and reject our prior determinations, and therefore address each contention only briefly.

Defendant first argues that the Illinois death penalty violates due process for failing to require that the State prove beyond a reasonable doubt that there are no mitigating factors sufficient to preclude the imposition of the death sentence. This argument has been rejected in *People v. Kubat* (1983), 94 Ill. 2d 437, *rev'd on other grounds* (7th Cir. Jan. 24, 1989), Nos. 88—1440, 88—1520, and in *People v. Free* (1983), 94 Ill. 2d 378, and defendant has presented no new arguments which warrant reconsideration.

Defendant next argues that the Illinois death penalty statute is unconstitutional because once a defendant has been found eligible for the death penalty it then places the burden on the defendant to prove that death should not be imposed. This court has consistently upheld the provisions of the statutory system which, only after the State has met its burden of proving the presence of an aggravating factor, shifts the burden to the defendant to come forward with evidence of mitigating factors sufficient to preclude the imposition of the death penalty. (*People v. Del Vecchio* (1985), 105 Ill. 2d 414, 446; *People v. Olinger* (1986), 112 Ill. 2d 324, 351; *People v. Morgan* (1986), 112 Ill. 2d 111, 147-48; *People v. Whitehead* (1987), 116 Ill. 2d 425, 465.) We decline to reconsider our well-established holding absent a compelling argument to do so.

Defendant next argues that the Illinois death penalty is unconstitutional because it does not sufficiently minimize the risk of an arbitrarily or capriciously imposed death sentence. Although defendant acknowledges that various aspects of the statute are not individually unconstitutional, he nevertheless argues that the statute in its totality is unconstitutional. While this court is cognizant of that old adage that the whole is greater than the sum of its parts, we fail to see how such an adage could be of assistance in such a case as this. If all of the individual

aspects are constitutional, we stand by the conclusion that the whole is also constitutional. We will briefly discuss the individual issues presented. This court has rejected a claim of unconstitutionality on the ground that the statute vests unguided discretionary authority in the prosecutor to seek the death penalty. (*People v. Silagy* (1984), 101 Ill. 2d 147, 161.) Also rejected has been the argument that the failure to require pretrial notice of an intent to seek the death sentence renders the statute unconstitutional. (*People v. Silagy* (1984), 101 Ill. 2d 147, 161-62.) An attack on the "limited comparative proportionality review which this court undertakes" has also been rejected. (See *People v. Walker* (1985), 109 Ill. 2d 484, 508 (and cases cited therein).) We have not recognized a requirement for written findings by the sentencer (*People v. Albanese* (1984), 104 Ill. 2d 504, 540-41; *People v. Kubat* (1983), 94 Ill. 2d 437, 504, *rev'd on other grounds* (7th Cir. Jan. 24, 1989), Nos. 88—1440, 88—1520), nor have we recognized a claim that the statute is unconstitutional based on an alleged inadequacy of pretrial notice of aggravating evidence (*People v. Albanese* (1984), 104 Ill. 2d 504, 540). Neither is the statute infirm due to an alleged absence of burden of proof on the prosecution to prove aggravation/mitigation factors. (*People v. Sanchez* (1986), 115 Ill. 2d 238, 269.) Finally, the statute is not unconstitutional based on the sentencer's being precluded from considering the severity of the sentencing alternative to the death penalty. *People v. Stewart* (1984), 104 Ill. 2d 463, 495.

Defendant's last constitutional attack argues that the Illinois death penalty is unconstitutional because it bars the sentencer from considering sympathy for the defendant. Assertions that *California v. Brown* (1987), 479 U.S. 538, 93 L. Ed. 2d 934, 107 S. Ct. 837, supports his position are without merit. In *Brown* the Supreme Court held that an instruction that jurors not be swayed by

mere sentiment, conjecture, sympathy, passion, prejudice, or public opinion or feeling in the penalty phase of a murder trial did not violate the Constitution. The Court stated:

> "Even a juror who insisted on focusing on this one phrase [sympathy] in the instruction would likely interpret the phrase as as admonition to ignore emotional responses that are not rooted in the aggravating and mitigating evidence introduced during the penalty phase. While strained in the abstract, respondent's interpretation is simply untenable when viewed in light of the surrounding circumstances. *** We think a reasonable juror would reject that interpretation, and instead understand the instruction not to rely on 'mere sympathy' as a directive to ignore only the sort of sympathy that would be totally divorced from the evidence adduced during the penalty phase.
>
> ***
>
> An instruction prohibiting juries from basing their sentencing decisions on factors not presented at the trial, and irrelevant to the issues at the trial, does not violate the United States Constitution. It serves the useful purpose of confining the jury's imposition of the death sentence by cautioning it against reliance on extraneous emotional factors, which, we think, would be far more likely to turn the jury against a capital defendant than for him. And to the extent that the instruction helps to limit the jury's consideration to matters introduced in evidence before it, it fosters the Eighth Amendment's 'need for reliability in the determination that death is the appropriate punishment in a specific case.' [Citation.]" 479 U.S. at 542-43, 93 L. Ed. 2d at 940-41, 107 S. Ct. at 840.

Defendant alleges that the Illinois statute does not allow for distinguishing between sympathy based on the evidence and sympathy which is properly excluded. This is simply inaccurate. Quite to the contrary, the sentencer is required to consider various factors in mitigation presented by the defendant as well as factors in aggrava-

tion. (Ill. Rev. Stat. 1981, ch. 38, par. 9—1(c).) Thus, rather than relying on "extraneous emotional factors" the sentencer is limited to consideration of "matters introduced in evidence before it." This court has reviewed the constitutionality of the death sentence under similar arguments and has continued to reject such a constitutional attack. (See, *e.g.*, *People v. Britz* (1988), 123 Ill. 2d 446, 479-80; *People v. Spreitzer* (1988), 123 Ill. 2d 1, 42-43; *People v. Crews* (1988), 122 Ill. 2d 266, 291-93.) The defendant has not indicated a statement or action of the court that would indicate an improper application, nor do we find anything improper on our own independent review. The court properly weighed the factors in mitigation and did not prejudice the defendant.

For the foregoing reasons, the defendant's convictions and his sentence of death are affirmed. The clerk of this court is directed to enter an order setting Wednesday, September 13, 1989, as the date on which the sentence of death entered in the circuit court is to be implemented. The defendant shall be executed by lethal injection in the manner provided by section 119—5 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1987, ch. 38, par. 119—5). The clerk of this court shall send a certified copy of the mandate in this case to the Director of Corrections, to the warden of Stateville Correctional Center, and to the warden of the institution wherein the defendant is confined.

*Judgment affirmed.*

WARD and CALVO, JJ., took no part in the consideration or decision of this case.