2022 IL App (1st) 172484-U

No. 1-17-2484

Order filed February 3, 2022

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of |
| Plaintiff-Appellee, | ) ) | Cook County. |
| v. | ) ) | No. 14 CR 12511 |
| MICAH JEFFERSON, | ) ) | Honorable Michael B. McHale, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE LAMPKIN delivered the judgment of the court.
Justices Rochford and Martin concurred in the judgment.

**ORDER**

¶ 1    *Held*:  (1) Two improper comments made by the prosecutor during the cross-examination of defendant did not rise to the level of plain error.

(2) The trial court did not err by denying defendant's (a) requested jury instruction for domestic battery as a lesser-included offense of aggravated criminal sexual assault, and (b) request to admit into evidence several letters the victim wrote to him while he was in jail.

¶ 2     After a jury trial, defendant Micah Jefferson was convicted of four counts of aggravated criminal sexual assault and sentenced to 13 years in prison on each of those counts, the sentences to run consecutively for a total of 52 years' imprisonment.

¶ 3     On appeal, defendant argues that he was deprived of a fair trial by the prosecution's misconduct during opening statements, the examination of the witnesses, and closing and rebuttal arguments. He also argues that the trial court erred by refusing his requested instruction for domestic battery as a lesser-included offense and by denying his request to admit into evidence certain letters the victim wrote to him while he was in jail.

¶ 4     For the reasons that follow, we affirm the judgment of the circuit court.[1]

¶ 5                                     I. BACKGROUND

¶ 6     Defendant, Micah Jefferson, based on his conduct on June 28, 2014, was charged with multiple counts of aggravated kidnaping and aggravated criminal sexual assault ("ACSA") against S.M., his girlfriend and the mother of his child.

¶ 7     During pretrial proceedings, defendant moved the court to admit several letters S.M. wrote and sent to him while he was in jail pending trial. The trial court denied the motion. Later, defendant again sought to have all of the letters admitted at trial, but the court found that only one letter, dated March 6, 2015, was relevant and would be admissible.  The jury trial commenced in April 2017, and defendant represented himself *pro se*.

¶ 8     S.M. testified that she was in a relationship with defendant in 2013 and 2014. When she first met defendant, she communicated with him by writing letters and visiting him. Their friendship

---

[1] In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

then developed into a romantic relationship. She and defendant have a son, who was born in December 2013. In the first apartment where S.M. and defendant lived together, she paid the rent and only her name was on the lease. She worked as a certified nursing assistant, but defendant was never employed during the course of their relationship. She provided insurance for their son. Defendant watched the baby while S.M. was at work.

¶ 9     In February 2014, S.M. and defendant had an argument about problems in their relationship, including their finances and defendant's infidelity and drug use. She was the only one working, and all of the bills except the Comcast bill were in her name. Their argument led to a physical altercation wherein defendant grabbed her neck and "attempted to choke [her] out." Defendant stopped because the baby was hungry, and S.M. nursed him. Defendant then threatened S.M. with a kitchen knife and said that he was going to stab her as soon as the baby was done eating. However, defendant fell asleep before the baby finished nursing. S.M. put the baby down and cooked food for defendant. She did not call the police because she was in shock and did not really know what to do. When defendant woke up, they talked, and he agreed that it would not happen again.

¶ 10     Later, S.M. signed a new lease for a Chicago apartment where she, defendant and the baby lived. In June 2014, S.M. had another argument with defendant where he announced that she needed to be punished. He told her to lay across his lap and then struck her buttocks with his hand. Defendant initially hit her on her buttocks over her clothes, but then he hit her on her bare skin. The hitting continued for about one minute. S.M. sustained a bruise and found it painful to sit the next day. At some point, she told defendant that she did not appreciate being treated that way, and defendant said he would not do it again.

¶ 11    On June 27, 2014, S.M. and defendant had an argument about defendant not waking up for his classes at a career training school. He went out drinking the night before and got angry when S.M. tried several times to wake him. He grabbed her neck with his hands and attempted to "choke [her] out." S.M. fought back and tried to kick him. After a while, they both became exhausted. Defendant took her by the arm, put her in the bedroom closet, and shut the door. It was hot in the closet, and S.M. was scared. She remained in the closet for 20 to 30 minutes until defendant allowed her to come out. She told defendant that this could not happen again.

¶ 12    Later that evening, S.M., defendant, and the baby returned to their apartment after being at defendant's parents' house. Defendant decided to go out again, and S.M. stayed home with the baby. She was scheduled to work the next day at 7 a.m. She used public transportation and had to leave their apartment no later than 6 a.m. to get to work on time. Defendant returned home around 5:30 a.m. on June 28, 2014. S.M. had just woken up to get ready for work. Defendant was happy when he got home and told S.M. that his cousin had been arrested but he and his brother got away. Defendant was very excited and wanted to have sex with S.M. right then, but she told him that she had to go to work and did not have time. He told her more about his experience and then started performing oral sex on her. Defendant put his mouth on her vagina, and she did not resist at that point. Then he put his penis into her vagina, and they had vaginal intercourse for a short while. She told defendant that she had to get ready for work, and defendant stopped.

¶ 13    S.M. looked at her phone to check the time and saw an alert from her bank about a $203 withdrawal the night before. She had given defendant her debit card the night before because her clothes did not have pockets. She asked defendant about the withdrawal, and he responded that he needed the money to bail out his cousin. She told defendant that his story did not make any sense,

and he told her that he actually lent the money to his brother. She told defendant that they needed the money back to pay their rent in two days. She was angry and yelled at defendant.

¶ 14  Defendant told her not to talk to him like that. He jumped up, threw her down onto the bed, and began hitting her on her buttocks with his hand.  She was not wearing any clothes at that time. She cried and asked him to stop, but he told her to be quiet. She was not quiet, so defendant removed his belt from his jeans and began striking her with the belt on her thighs and lower back. S.M. testified that the lashings were very painful. She cried and begged him to stop but he told her to count each time that he struck her with the belt and say "I'm sorry sir" for yelling at him. S.M. counted to 20, but lost count after that, and the lashings continued. She felt like she could not take it anymore and turned on her side to try to stop him from hitting her. He told her to turn back onto her stomach, but she said no and begged him to stop. He then told her that she was "going to suck [his] d*ck." S.M. started to perform oral sex on him by putting his penis in her mouth. This went on for a few minutes, and then she begged him to stop so that she could go to work. Defendant, however, told her to lay back on the bed. She got scared, grabbed some nearby clothes and ran out of the apartment door naked. She stopped at the top of the stairs to try to put on her clothes, but defendant followed her and dragged her back into the apartment.

¶ 15  Defendant made S.M. lay on the bed and struck her again with the belt. She begged him to stop, but he would stop only if they were having sex. He put her on top of him and entered her vagina with his penis. Her body hurt from the lashings. During intercourse, defendant either held the belt or had it next to him. S.M. cried and asked him to stop, but he refused.  At some point, she heard the baby crying and asked defendant to stop so she could get the baby. Defendant refused to stop and continued, alternating between beating her and making her perform sex acts. Then he told

her to get the extension cord from the dining room and, the longer she took to retrieve it, the harder he would beat her with it.

¶ 16    S.M. left the bedroom and heard defendant counting. Although she thought about escaping, she was afraid the situation would get worse if defendant caught her, was afraid for her life and was afraid to leave her son behind even though defendant never threatened or hit the baby during their relationship. She retrieved the extension cord and gave it to him. He then hit her with the extension cord on her back, buttocks, and legs. The lashings were very painful. She begged him to stop but he refused. While he hit her with the extension cord and belt, he stuck his finger into her anus, put his penis into her anus, and put his fingers into her vagina. While he made her perform oral sex on him, he digitally penetrated her anus, which hurt and was uncomfortable. She told him that it hurt and asked him to stop, but he said that he had to open her anus to stick his penis inside. Then he put his penis into her anus and vagina and told her that she had to "make him come" before he would let her go to work. He also told her that he would beat her again when she got home from work. She did not think that he ever ejaculated. Then he told her to lick his penis and "balls." As S.M. performed oral sex on him, she noticed that he began to fall asleep, so she just continued until he actually fell asleep.

¶ 17    After defendant fell asleep, S.M. tried to clean her hands and face with a baby wipe. Then she nursed her son in the living room. After she finished nursing, she retrieved her phone from the bedroom and saw that she had missed calls from her supervisor. She returned the call, apologized, and said that she would not make it into work due to a family emergency. S.M. then put on her scrubs, testifying that she did not know why she put on her work clothes of all things. She packed up the diaper bag, got the stroller and breast pump, and left with the baby. She walked to the closest

bus stop and took it to the rapid transit line. At that point, she called Laurie L., her father's girlfriend. S.M. was very close to Laurie at the time and did not know where to go or what to do. S.M. went to the bank and cancelled her debit card to prevent any further withdrawals from her account. Then she walked from the bank to her father and Laurie's house.

¶ 18    When she arrived at their house, she told them happened. Her father took her to the police station, where she told the police what happened. She then went to the hospital emergency room, where she was examined by a doctor and consented to a rape kit examination. The doctor took swabs from S.M.'s mouth, vagina, and anus. She was also photographed. When Chicago police detective Melissa Fuller arrived at the emergency room, S.M. gave Fuller the apartment keys and consent to search the apartment. Later, S.M. returned to the police station and spoke with an assistant state's attorney (ASA) about the incident. S.M. subsequently went to court and got an order of protection against defendant. S.M. never went back to her apartment.

¶ 19    S.M. also identified photograph exhibits of the injuries to her body that she received as a result of defendant beating her with the belt and extension cord. She testified that she did not consent to any of those beatings and defendant forced her to engage in all of the sex acts she described once the beatings started. S.M. testified that everything in her statement to the police on June 28, 2014, was true.

¶ 20    S.M. did not have any contact with defendant after the incident until she first accepted a telephone call from him on September 22, 2014, after he had called her multiple times. Afterward, she had a series of conversations with him over the next six months. She interacted with defendant while he was incarcerated because she wanted their son to have his father in his life. They talked about their relationship and the incident that occurred on June 28, 2014. They also talked

about the possibility of getting back together and defendant's need for counseling. Defendant repeatedly asked her to change her original signed statement to the police and say that she was not raped, but S.M. never changed her statement. She did, however, withdraw the order of protection at defendant's request. Also at defendant's request, she met with an ASA, met with defendant's counsel, and visited defendant at the jail. In addition, she put money on his commissary account.

¶ 21    S.M. stated that she and defendant both knew that their phone conversations were recorded but did not think that anyone would really listen to them. She listened to a number of the recordings with the ASA, identified her voice and defendant's voice, and testified that they were true and accurate recordings of their phone calls. The State published excerpts from eight of those phone conversations, and S.M. discussed some of them in court.

- During their October 2, 2014 phone call, defendant asked S.M. to perjure herself. She told him that she was not willing to do that and did not want to get in trouble for lying under oath. Defendant said, "You won't get in trouble," and gave her an example of how a friend had lied for him before and did not get in trouble.

- During their October 7, 2014 phone call, S.M. and defendant discussed her fear of him and the June 28, 2014 incident. Defendant admitted that he choked her twice before and remembered what happened on the morning of June 28, 2014. He said that there was "no excuse to do what [he] did" and "[he] should never have hit [her]."

- During their February 4, 2015 phone call, defendant asked S.M. to retract her statement. He told her to say that the "police basically coerced [her] to say that sh*t." However, S.M. said that the police did not coerce her.

- During their February 17, 2015 phone call, defendant spoke with S.M. about the book titled "50 Shades of Grey" and asked her to read the book, but she declined and stated that it was nothing that she was "into."

- During their July 6, 2015 phone call, S.M. spoke with defendant about his trial strategy. She asked what he was going to say in court and if he was going to lie. He responded that he did not know what he was going to come up with yet and was "going to have to be slick like" S.M.

¶ 22 S.M. also wrote defendant letters while he was incarcerated. In her March 6, 2015 letter to him, she wrote about how she felt about this case and that she had reviewed her statement with an investigator for any inaccuracies but could not change any part of her statement because she did not lie or exaggerate. She also wrote:

"Nowhere in the statement do I say you raped me. I talked to the investigator about how it wasn't what it seemed like. I was angry as hell at you, but that doesn't mean I didn't want to have sex with you. You are damn near my husband, and there was never a time I wouldn't want to have sex with you."

S.M. also wrote that their sex was kinkier than average, and defendant never beat her before. She added that she wished she had left him so all of this could have been avoided.

¶ 23 S.M. testified that she told defendant in their phone conversation that they did not have to use the word "rape," but she did not enjoy what happened on the day in question and it was very painful and traumatic. Although she had told him in letters and phone calls that she missed him and loved him, she did not actually know her feelings then because the June 28 incident had been a

shock, she had experienced a rollercoaster of emotions, and she no longer hoped that she and defendant would work things out.

¶ 24     During their relationship, both she and defendant wanted to separate multiple times, and defendant never forced her to stay in their relationship. She felt very bad about herself due to his infidelity, and he pulled a knife on her and choked her during one of their arguments about his infidelity. She also slapped him on the cheek during one of their arguments. Before the June 28 incident, defendant never forced her to have intercourse. Moreover, she never received facial injuries from him.

¶ 25     At a sidebar, defendant asked to introduce S.M.'s April 11, 2015 letter to him. In that letter, she wrote that she still loved defendant, loved to hear his voice, and wanted him to call her even if he just yelled at her or said how much he did not want to be with her. The trial court determined that the letter was irrelevant and denied defendant's request. The trial court stated that it had read all the letters defendant attached as exhibits to his 2016 motion to admit S.M.'s letters. Then the court reiterated its ruling that those letters were irrelevant to the charged offenses or the issue of consent because none of the letters mentioned any prior sex act, violence, weapon, or anything similar to the pending charges. Defendant argued that the letters were relevant because they challenged S.M.'s credibility since they showed that she liked performing oral sex on him and wanted to continue a sexual relationship with him. Still, the trial court ruled that the letters were irrelevant, stating that although S.M. wrote some sexually explicit statements, she never wrote about having rough sex with defendant, defendant hitting her, or that she enjoyed those types of acts.

¶ 26    Laurie L. testified that about 9 a.m. on June 28, 2014, she received a call from S.M., who was very upset. S.M. told Laurie that she had a terrible morning, defendant came home drunk and choked her and hit her with a belt and extension cord, and she was tired of the situation and needed to get away from her apartment. Laurie told S.M. to come to their house, but S.M. said that she needed to go to the bank first to close her account. She also told Laurie that she and the baby could not be picked up by car because S.M did not have a car seat, just the stroller and several items she had carried from the apartment. Laurie spoke with S.M. several times over the next 30 to 45 minutes because Laurie was very concerned about her, so S.M. frequently checked in and told Laurie where she was and how she was doing.

¶ 27    When S.M. arrived at Laurie's house, S.M. started crying and talking with Laurie about what happened. Laurie brought a full-length mirror into the kitchen so S.M. could see her injuries. When S.M. disrobed, Laurie observed welt marks on S.M.'s back and buttocks, and bruises on her thighs and buttocks. S.M. also told Laurie that her throat hurt from getting choked. Laurie looked closer and saw bruising around S.M.'s throat, under her earlobe, and around her chin. Laurie also saw what appeared to be a bite mark on S.M.'s collarbone. While they were looking at her injuries, S.M. started to cry and told Laurie that she had been raped. S.M. did not tell Laurie every detail, but she did say that defendant beat her and forced her to have anal, oral, and vaginal sex with him. Laurie told S.M. to really consider leaving defendant and calling the police. S.M. agreed, so they told S.M.'s father, who had been in another room with S.M.'s baby, and they went to the police station.

¶ 28    Laurie never saw defendant physically assault S.M. and never saw S.M. with any bruising while she had dated defendant. However, Laurie thought S.M. might have had a split lip when she

and defendant were living together in their first apartment. Laurie observed that defendant was verbally abusive to S.M., had a short temper and controlled S.M. with his language by using an aggressive tone or calling her a "b*tch." Laurie also observed S.M. and defendant have arguments about the car and money.

¶ 29    Chicago Police Detective Melissa Fuller was assigned to S.M.'s case. Detective Fuller went to the emergency room on the date in question, learned about S.M.'s injuries from the attending physician, spoke with S.M. directly about the incident that occurred at her apartment that morning, and observed S.M.'s injuries. S.M. signed a consent to search form and gave the keys to her apartment to Detective Fuller. Detective Fuller arrived at the apartment with two back-up officers around 4:30 p.m. on June 28, 2014. They entered the apartment using S.M.'s keys, found defendant asleep on the bed, and placed him in custody. The extension cord and belt used during the incident were on the floor next to the bed. An evidence technician collected the evidence and photographed the apartment.

¶ 30    Dr. Jacklyn Schieber testified that she treated S.M. in the emergency room on the date in question. The medical records showed that the triage nurse reported that S.M. complained of the following:

> "Boyfriend got home from work around 5:30 this morning and wanted to have sex with me. Patient told him that she didn't want to have sex this morning and that she had to get ready to go to work. Patient stated that he started performing oral sex on her but did not want to. Boyfriend got angry. She was upset with him for taking money out of her bank account. Patient was beat by her boyfriend at this point and being punished on and off until approximately 8:30. Patient left and went to her father's house, brought here. She's

complaining of pain to her bottom after being beat by a belt and an extension cord and forcing anal sex."

¶ 31    Dr. Schieber spoke with S.M. and learned the same information that the triage nurse wrote in her notes. After she spoke with S.M., Dr. Schieber conducted a physical examination and noticed linear abrasions and extensive bruising to S.M.'s thighs and buttocks, which were consistent with being hit by something. Dr. Schieber then performed a genital exam and observed bruising, as well as an abrasion inside of S.M.'s vagina, which was consistent with sexual assault. Dr. Schieber examined S.M.'s anus and observed redness around her anus, which was also consistent with sexual assault. Dr. Schieber testified that she administered a sexual assault kit to S.M. and collected samples with swabs from inside S.M.'s vagina and the area surrounding her anus.  She gave the kit to the police and diagnosed S.M. with the following:

"(1) victim of physical assault; (2) victim of sexual aggression; (3) contusion to her back; and (4) contusion to her buttocks."

¶ 32    On cross-examination, Dr. Schieber testified that it was possible for an abrasion to the wall of the vagina to occur during consensual rough sex, she did not observe any tearing or bleeding to S.M.'s rectum, and did not observe any bruises on S.M.'s arms or neck, though S.M. did have an abrasion on the back of her neck.  Dr. Schieber also testified that S.M. did not have any facial injuries and did not appear to have been strangled.

¶ 33    S.M.'s vaginal, oral, and rectal swabs tested negative for semen but were preserved for DNA analysis in case they contained skin cells. One of three stains in S.M.'s underwear tested positive for semen and was preserved for DNA analysis. Defendant's buccal swab was also preserved for DNA analysis.  A forensic scientist qualified as an expert in the fields of forensic

DNA analysis and biology testified that (1) DNA profiles were obtained from S.M.'s standard and defendant's standard, (2) the DNA analysis conducted on the vaginal, oral, and rectal swabs found insufficient male DNA to continue with analysis, and (3) the DNA analysis conducted on the stain from S.M.'s underwear identified a major male DNA profile that matched defendant.

¶ 34 An investigator assigned to the telephone monitoring unit at the Cook County jail testified that the jail recorded all telephone calls made by inmates and each inmate was assigned a unique PIN to make phone calls. The investigator searched the inmate phone system for calls with defendant's PIN and download those recordings to a CD. The investigator's search produced multiple CDs with hundreds of phone calls made by defendant. The investigator identified as exhibits the recordings of phone calls defendant made on June 30, 2014, August 24, 2014, September 11, 2014, and September 26, 2016. Clips of each of those phone calls were played for the jury.

¶ 35 After the State rested, the court admonished defendant that he would be limiting himself to arguing reasonable doubt if he did not testify that the sex acts were consensual. When defendant asked the court if he would be able to argue the other letters written by S.M., the court explained that he was limited to using the March 6, 2015 letter and reiterated its prior ruling. Specifically, the court stated that the letters were all written after the incident, only the March 6, 2015 letter discussed the facts of the case, none of the letters discussed S.M.'s desire to have rough sex with defendant or be hit with a belt or extension cord, and whatever S.M. may have wanted to do sexually with defendant in the future was irrelevant to this case because it did not mean that she consented to the violent sexual attack in June 2014. The court then took a recess to allow defendant time to consider his options.

¶ 36    When the trial resumed, the trial court supplemented its ruling regarding the letters. The trial court stated that S.M. testified to having prior consensual sex with defendant and having a son together. S.M.'s March 6, 2015 letter, which the court allowed defendant to present, showed that her desire to have sex with defendant did not involve violent conduct. Specifically, S.M. wrote that her statement to the police did not say that defendant raped her and her anger at defendant did not mean that she did not want to have sex with him. S.M.'s letter made clear, however, that wanting to have sex with defendant did not include violent sex and, although their sex was kinkier than average, defendant never beat her before. The court stated that, in the other letters, S.M. discussed wanting defendant to have a relationship with their son, Christmas gifts, books and movies that she recommended to defendant, and sending him money in jail. The court stated that the letters also contained some very explicit sexual fantasies, but none of them involved violent conduct. Therefore, the court ruled that the other letters were not impeaching and not relevant to the specific issues in the case.

¶ 37    Defendant then elected to testify. Specifically, he stated that when he came home around 5:30 a.m. on June 28, 2014, S.M. became angry about some bank withdrawals and thought he had been unfaithful to her by soliciting prostitutes. Defendant told her that he and his brother went to a stripclub but that he was not unfaithful. He told her that he did not want to argue and was going to leave. However, when he tried to leave, S.M. stood in front of the bedroom door and asked him to stay and talk it out. She told him that she was sorry, was wrong, and felt inadequate because he had cheated on her before in 2013. He told her that they would never move forward if she kept living in the past and that he was not cheating on her when he went out every day. S.M. said she understood and began kissing him. He returned her kisses, and then they lay on the bed and started having

intercourse. During that time, S.M. said that she wanted to be spanked with a belt, and he agreed since that was normal for their relationship. S.M. got up and retrieved a belt, and he asked her how many times she wanted him to spank her. S.M. responded "just 10 times." S.M. lay on the bed and he spanked her 10 times. He kissed her on the neck and asked if she was okay. She turned on her side and said, "I would tell you to stop if I wanted you to stop." Defendant replied, "Fair enough." S.M. grabbed him by the shirt, pulled him down onto the bed, and they continued kissing and having intercourse.

¶ 38 While they were having intercourse, S.M. told him that she wanted him to spank her with something else. She left the bedroom and returned with an extension cord. Defendant asked her if she was sure she wanted him to spank her with the cord because it could hurt, and S.M. told him "Yeah, I'm sure. I don't care." Defendant then spanked her 10 times with the cord. When he mistakenly hit her on her lower back three times, he asked her if she still wanted him to spank her. She replied, "Yes, you['re] killing the moment if you keep asking me this. I just want you to do this." So, defendant continued and started kissing her again.

¶ 39 Defendant testified that he could not perform sexually the way S.M. wanted him to, so she said, "Well, allow me to perform oral sex on you." Defendant replied, "All right, if you want to." S.M. then started performing oral sex on him, but he still could not perform the way she wanted, so he told her that they could just wait until she got back from work. S.M. had an attitude, got up, and walked away. When she returned to the bedroom about five minutes later, she was angry, threw her phone at him, and told him that one of his girls had texted S.M.'s phone looking for him. S.M. said she did not want to be with him anymore and took a swing at him. He ducked and told her that he was going to leave. She responded, "No, I'm going to leave." He said that if she left, he was not

going to be there when she got back. She packed up the baby's things, got the baby and the stroller, and left. Her last words to him were, "Well, I've got something for you." Defendant went to sleep and was awakened by 10 police officers with their guns drawn. Defendant testified that they kicked in the door, told him to get on the ground, and took him to the police station.

¶ 40     Defendant acknowledged that he called S.M. from jail on multiple occasions and said that he was sorry he hurt her, had screwed things up, in part, by "f*cking around with drugs," was drunk, and was sorry. However, he testified that he meant he was sorry for staying out all night and cheating; he denied apologizing for anything that had to do with the sexual intercourse on June 28, 2014. Defendant acknowledged that he made other phone calls from jail to his friends wherein he laughed at S.M. for believing that he had agreed to attend counseling with her when he was merely play acting and actually intended to leave her after he convinced her to drop the charges against him. He also told his friends to call and message S.M. every other day and tell her that he loved and forgave her, and she needed to drop the charges against him.

¶ 41     Defendant denied telling S.M. that she would get only 30 days for perjury or that a friend had lied for him on a different case. When S.M. discussed her fear on the date at issue and mentioned defendant choking her the day before, he asserted that he did not refute her accusations because he knew she would get mad, not talk with him anymore and his "life was in her hands." Defendant testified that he was angry with S.M. and did hit her with a belt, but that was another time.

¶ 42     In rebuttal, the State admitted certified copies of defendant's convictions for robbery—one in 2008 and one in 2012.

¶ 43    During the jury instruction conference, defendant requested a lesser-included offense instruction for domestic battery. The trial court denied defendant's request, stating that the proposed instruction failed the charging instrument approach because the offenses contained completely different elements. The court also found that the jury could not rationally find that defendant committed the lesser offense and acquit him on the greater offense where defendant admitted sexual penetration and argued consent but forced sexual penetration was an element in each charge. The court stated it would not be rational for a jury to disregard the sexual penetration and find defendant guilty of the lesser charge.

¶ 44    Following closing arguments, the jury found defendant guilty of four counts of ACSA, specifically that his finger entered S.M.'s anus, that his penis contacted her anus, that his penis contacted her vagina, and that his penis entered her mouth—all by the use of force or threat of force and causing bodily harm to S.M. The court appointed counsel to represent defendant posttrial. The court denied defendant's motion for new trial. Following aggravation and mitigation, the trial court sentenced defendant to 13 years in prison on four counts of ACSA, the sentences to run consecutively for a total of 52 years' imprisonment. The trial court denied defendant's motion to reconsider the sentence, and defendant appealed.

¶ 45                                    II. ANALYSIS

¶ 46                              A. Prosecutorial Misconduct

¶ 47    Defendant argues that the State engaged in prosecutorial misconduct throughout his trial. Specifically, defendant challenges certain statements made during the State's opening statement, examinations of S.M. and defendant, and closing and rebuttal arguments.

¶ 48    The court reviews *de novo* the legal issue of whether a prosecutor's misconduct, like improper statements at closing argument, was so egregious that it warrants a new trial. *People v. Wheeler*, 226 Ill. 2d 92, 121 (2007); see also *People v. Tyler*, 2015 IL App (1st) 123470, ¶ 151 (under *de novo* review, the reviewing court performs the same analysis that a trial judge would perform). The reviewing court asks whether the misconduct "engender[ed] substantial prejudice against a defendant such that it is impossible to say whether or not a verdict of guilt resulted from them." *Id*. at 123. "Misconduct in closing argument is substantial and warrants reversal and a new trial if the improper remarks constituted a material factor in a defendant's conviction." *Id*.

¶ 49    Our supreme court has held that a "trial court's determination of the propriety of [closing argument] remarks will not be disturbed absent a clear abuse of discretion." (Internal quotation marks omitted.) *People v. Blue*, 189 Ill. 2d 99, 128 (2000); see also *People v. Caffey*, 205 Ill. 2d 52, 89 (2001) (an abuse of discretion occurs when the trial court's ruling is arbitrary, fanciful, or unreasonable or when no reasonable person would take the view adopted by the trial court). The supreme court also has held that *de novo* review applies to the question whether prosecutorial comments in closing argument "were so egregious that they warrant a new trial." *People v. Wheeler*, 226 Ill. 2d 92, 121 (2007). Several decisions of this court have found that the appropriate standard of review for claims of improper closing argument comments is unsettled in light of an apparent conflict between *Blue* and *Wheeler*. See *People v. Kelley*, 2015 IL App (1st) 132782, ¶ 74. But in *People v. Cook*, 2018 IL App (1st) 142134, ¶ 63, we examined the holdings of *Blue* and *Wheeler* and found no conflict between them. Rather, we explained that the abuse of discretion standard applies to a trial court's determination regarding the propriety of challenged closing

argument comments and that *de novo* review governs the separate question of whether any improper comments were sufficiently egregious to warrant a new trial. *Id*. ¶ 64.

¶ 50 Here, defendant failed to object at trial to any of the State's remarks or questions that he now challenges on appeal. As such, the trial court never had the opportunity to exercise its discretion to these challenged statements, and these issues are forfeited on review. See *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). Recognizing the procedural default, defendant seeks review by invoking the plain error doctrine. Accordingly, the *de novo* standard of review applies to defendant's claim of prosecutorial misconduct.

¶ 51 Plain error is a narrow and limited exception to the general forfeiture rule. The exception is to be invoked only where a clear or obvious error occurred and: (1) the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) the error is so serious that it affected the fairness of defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). Under both prongs, defendant bears the burden of persuasion. *People v. Hillier*, 237 Ill. 2d 539, 545 (2010). The first step of plain error review, however, is determining whether any error occurred. *People v. Thompson*, 238 Ill. 2d 598, 613 (2010); *People v. Alvidrez*, 2014 IL App (1st) 121740, ¶ 25.

¶ 52                                  1. Opening Statement

¶ 53 An opening statement in a criminal trial should outline the facts that the prosecutor in good faith expects to prove, and reversible error occurs only where the impropriety is attributable to the deliberate misconduct of the prosecutor and results in substantial prejudice to the defendant. *People v. Jackson*, 281 Ill. App. 3d 759, 774 (1996). The good faith of the prosecutor in making

the remarks is an important consideration in determining whether she has committed reversible error. *People v. Sheridan*, 57 Ill. App. 3d 765, 772 (1978). Moreover, an improper prosecutorial remark may be cured when the court instructs the jury to disregard arguments not based on the evidence and to consider only the evidence that has been presented. *People v. Favors*, 254 Ill. App. 3d 876, 886 (1993).

¶ 54    First, defendant argues that the prosecutor erred during opening statements by improperly commenting or making claims about the "typical" habits and patterns of domestic violence abusers in general without providing any supporting evidence. Specifically, defendant challenges the following statement by the prosecutor:

>       "The crux and nature of this case is about violence and very little to do with sex specifically domestic violence, and what this case is about is power and control and the dehumanizing of a domestic partner which [knows] no social and economic boundaries even gender boundaries, but this is about power and control, and you will see the *typical* nature of how domestic violence develops during the course of the relationship, and how there is explosive, physical violence followed by a period of making up and going on with business as usual, but the reciprocal nature is that these acts become more violent and dehumanizing, and the duration by which there is that short honeymoon period becomes shorter, and that's exactly what happened in this case up until the ultimate dehumanizing acts where the victim was not only physically brutalized by this defendant who still intends to control her till this day where he violated her in the most sensitive places of her body making her feel something absolutely less than human." (Emphasis added.)

¶ 55    Contrary to defendant's argument, our review of the record, particularly the start of the prosecutor's closing argument, indicates that the prosecutor used the word "cyclical" during her opening statement instead of the word "typical," as recorded by the court reporter. However, even assuming the prosecutor used the word "typical" one time in that context during her opening statement, she did not discuss the general common patterns of behavior in domestic situations that involve abuse or violence. Rather, she discussed the regularly recurring series of events in the specific relationship between defendant and S.M and explained that the instant case was more about the domestic violence between them, rather than sex. Furthermore, sufficient evidence in the record supported the prosecutor's statement. The evidence showed that S.M. was in a relationship with defendant in 2013 and 2014; during an argument in February 2014, defendant grabbed her by the neck and attempted to choke her; after that incident, she spoke with defendant and he agreed that it would not happen again; the relationship continued and a few months later during an argument in June 2014, defendant punished her by striking her on her buttocks repeatedly, causing her pain and bruising; after that incident, she told defendant that she did not like being treated that way and defendant said he would not do it again; the relationship continued and later the same month, on June 27, 2014, she had another argument with defendant that culminated in him attempting to choke her and putting her in a closet; after that incident, she told him that it could not happen again; and then the next morning, on June 28, 2014, he violently sexually assaulted her. Therefore, the prosecutor's comments were based on the evidence, specifically the cycle and development of the domestic violence that emerged in S.M.'s relationship with defendant, including the fact that he became more violent with her over the course of their relationship, the make-up periods following the assaults, and the shortened periods of time between the assaults. We conclude the prosecutor's comment was not error.

¶ 56    Second, defendant argues the prosecutor improperly remarked that defendant was "at rock bottom as low as a human being can be" when he met S.M. Defendant contends that statement was argumentative and was not supported by the evidence. We disagree. The comment was a fair characterization of the evidence, which showed that defendant was a twice convicted felon when he met S.M.; he never had a job during the course of their relationship; he went out every night and would not wake up for school in the morning; he had a substance abuse problem; he did not pay any of their bills; and his name was not on the lease to either of their apartments.

¶ 57    Third, defendant argues the prosecutor's comments that defendant did not have a cell phone or bank account were improper because they were not based on the evidence. We disagree. S.M. testified that defendant did not have a job, she paid all of their bills, and defendant withdrew money from her bank account to loan money to his brother. In addition, defendant testified that one of his "girls" tried to contact him through S.M.'s phone. The prosecutor's comments that defendant did not have his own bank account or phone, therefore, were fair inferences based on this evidence. *People v. Crawford*, 2013 IL App (1st) 100310, ¶ 138 (an opening statement may include a discussion of the expected evidence and reasonable inferences from the evidence).

¶ 58    Fourth, defendant argues the prosecutor's statement that defendant contributed nothing in their relationship was actually contradicted by the trial evidence, which showed that he regularly cared for their child while S.M. was at work. However, when considered in the context in which the comment was made, it is clear that the prosecutor's comment related to defendant's failure to contribute financially during the course of their relationship and was fairly based on the evidence introduced at trial.

¶ 59 Fifth, defendant argues the prosecution erred by referencing the jury's oath and telling the jury that it had no choice but to convict defendant of all the charges against him. However, contrary to defendant's argument, the prosecutor instead told the jury:

> "[W]hen Danny and I are done presenting all of the evidence in this case you're going to get the law that spells out what is aggravated criminal sexual assault, and *based upon the evidence and based on the law* in the State of Illinois, and *if you follow your oath as jurors then you will sign, and you are compelled to sign each and every one of those guilty verdicts for the crimes he committed back on that morning,* and I'm going to come back here at the end of all of the evidence after you receive the law and ask you to do exactly that sign each and every guilty verdict." (Emphasis added.)

¶ 60 Reviewed in context, the prosecutor did not err by referencing the jurors' sworn duty and telling them that their oath required them to apply the facts to the law and, thereafter, sign the appropriate verdict forms based on the presented evidence. Importantly, the State's remarks here were qualitatively and quantitatively unlike any of the comments made in the cases relied upon by defendant. In *People v. Nelson*, 193 Ill. 2d 216, 226-27 (2000), the State mentioned the jury's oath no fewer than 12 times over the course of its rebuttal argument. The court stated that the oath was nothing less than the centerpiece of that argument, which concluded with the prosecutor's blunt statement that a guilty verdict was required by that oath. *Id.* at 227. In *People v. Castaneda*, 299 Ill. App. 3d 779, 783 (1998), the State ended its argument with three paragraphs about the jury's oath, again including the direct assertion that a not guilty verdict would be an abrogation of that oath. Similarly, in *U.S. v. Young*, 470 U.S. 1, 16 (1985), the prosecutor told the jurors that they

would not be doing their job if they acquitted the defendant. The single comment at issue here was nothing like those described above.

¶ 61    Here, the State told the jurors that, after they considered the evidence and applicable law in this case, they would need to sign every guilty verdict for the crimes they determined defendant had committed. The State did not tell the jurors that they would fail in their jobs as jurors if they found defendant not guilty, nor did the State ever say that an acquittal would be a violation of their oath. There is a stark contrast between the State's comments in this case and those in which reversible error was found. Taken in context, there was no danger that the prosecutor's remarks here caused the jury to abdicate its role as fact finder and convict defendant simply out of a sense of duty. See *People v. Beler*, 327 Ill. App. 3d 829, 836 (2002).

¶ 62                                    2. Direct and Cross-Examinations

¶ 63    First, defendant asserts the State erred when it elicited testimony from S.M. during direct examination that defendant was incarcerated when they first met. Defendant argues that this information prejudiced him because it was irrelevant and suggested to the jury that he was "a criminal who could not be believed." Specifically, defendant challenges the following line of questioning:

> "Q. Now, *without going into specifics*—well, how long did your relationship with [defendant] last let me start with that?
>
> A. About almost a year and a half.
>
> Q. *And without saying where specifically when you first met [defendant], did you have to visit him*?
>
> A. Yeah.

Q. And you communicated with him by you visiting him, or by you writing him letters?

A. Yes.

Q. Yes. And then did there come a point in 2013 when you were able to meet [defendant]?

A. Yeah.

Q. And did you start a relationship with him at that point?

A. Yes." (Emphasis added.)

¶ 64    Defendant's argument lacks merit. S.M. never testified that defendant was incarcerated when they met, and the State actually prevented her from saying that to the jury. Furthermore, the record on appeal fails to demonstrate that defendant was actually incarcerated at that time. While his presentence investigation report or the certified copy of his 2012 robbery conviction might have shown that he was incarcerated in relation to that charge when he and S.M. first met, those exhibits were not included in the record on appeal. Any doubts arising from an incomplete record are construed against the appellant. *People v. Smith*, 406 Ill. App. 3d 879, 886 (2010). Moreover, the jury properly heard evidence that defendant had two prior robbery convictions. Therefore, the jury knew that defendant was a criminal and could weigh his testimony accordingly.

¶ 65    Second, defendant argues the State erred when it asked him during cross-examination if he had any acting experience, thereby implying that he was acting and should not be believed. Specifically, defendant challenges the following line of questioning:

"Q. Let's talk about the phone calls that we did play. You said, hey, baby girl, I miss you. Thanks for picking up. Right?

A. Yes.

Q. And you just heard my partner play for you a phone call on September 26th when you said, hey, I just talked to [S.M.]—essentially along the lines of, f*ck that b*tch. She thinks I'm going to go to counselling with her, and you're laughing at her, weren't you?

A. Yes.

Q. We just heard that in open court. So you weren't going to go to counseling, right?

A. No, I wasn't going to get with her again at all.

Q. But you were going to beg her—we heard how you sounded on the phone, right? *So that was play acting right?*

A. Yes, because she had locked me up.

\* \* \*

Q. In fact, you and she, she told you she had never been so frightened that day. The only other time she was so scared was just the day before when you choked her out.

A. That's what she said.

Q. And what did you say back to her? You didn't deny it?

A. No, I cannot deny something with her, because then she's going to get ma[d] and not talk to me anymore.

Q. *So you were play acting on all these phone calls with her?*

A. I mean, she has my life in her hands. I'm not going to antagonize her.

Q. *Do you have any acting experience*?

- 27 -

A. No, I just know how Sarah is. When you say she's wrong, she's going to get very upset." (Emphasis added.)

The State's challenged question was sarcastic and argumentative. This improper remark, which we review below for plain error, occurred after defendant repeatedly admitted to lying to S.M. and "play acting" during his conversations with her while he was in jail.

¶ 66    Third, defendant states that, during his cross-examination, he testified that he did not contradict S.M. when she made certain statements on the telephone that defendant had now testified were not true because there was no point in arguing with her and when a person did argue with her, "then things like this happen." The prosecutor then remarked, "I can understand that with you."

¶ 67    We agree with defendant that the prosecutor improperly dispensed with asking questions and instead made an argumentative comment on defendant's answer. We review this improper remark below for plain error.

¶ 68                           3. Closing and Rebuttal Arguments

¶ 69    Prosecutors have wide latitude in the content of their closing arguments. *People v. Runge*, 234 Ill. 2d 68, 142 (2009). They may comment on the evidence and on any fair inference the evidence may yield, even if the suggested inference reflects negatively on the defendant. *People v. Perry*, 224 Ill. 2d 312, 347 (2007). A reviewing court will consider the closing argument as a whole, rather than focusing on selected phrases or remarks. *Id*. In assessing the propriety of an argument, the court is not obligated to assume that the jury accepted a comment's most damaging interpretation. *People v. Brooks*, 246 Ill. App. 3d 777, 784 (1993). The standard of review applied to a prosecutor's closing argument is similar to the standard used in deciding whether a prosecutor

committed plain error. *People v. Jackson*, 2020 IL 124112, ¶ 83. A reviewing court will find reversible error only if the defendant demonstrates that the remarks were improper and that they were so prejudicial that real justice was denied or the verdict resulted from the error. *Id.*

¶ 70    First, defendant argues that the prosecutor violated defendant's presumption of innocence by stating, "You now know exactly who [defendant] is. You now know he is a rapist."

¶ 71    Contrary to defendant's argument, the State never mentioned defendant's presumption of innocence during either its closing or rebuttal argument. *Cf. People v. Keene*, 169 Ill. 2d 1 (1995) (prosecution's statement that the defendant's presumption of innocence had now been "stripped away" was improper). Moreover, the State's characterization of defendant as a rapist was reasonable where it was based on the evidence. See, *e.g.*, *People v. Jackson*, 2012 IL App (1st) 092833, ¶ 45 (not improper to call defendant a "rapist" and "child molester" where those characterizations were "reasonable inferences drawn from the specific acts that [he] committed").

¶ 72    Second, defendant argues that the State improperly argued a fact not in evidence, *i.e.*, that he wanted the jury to believe that S.M. "wanted him to shove his penis into her anus." Defendant argues that because he did not personally testify to any anal sex, the State was precluded from making this argument.

¶ 73    This argument lacks merit. Defendant testified that S.M. initiated the sexual activity between them that morning, and S.M. testified that the sexual assault included defendant putting his penis into her anus. Also, Dr. Schieber testified that S.M.'s injuries to her anus were consistent with sexual assault. Accordingly, the State's comment was based on the evidence presented at trial or reasonable inferences drawn therefrom.

¶ 74    Third, defendant argues that the State's use of the extension cord during closing argument was prejudicial and improper. Defendant claims that the prosecutor's demonstration of defendant's use of the extension cord by striking counsel's table with the cord was done solely to inflame the passions of the jury and was not based on any evidence at trial regarding the amount of force that was used in the lashings.

¶ 75    We disagree. In context, the prosecutor's demonstration with the extension cord was proper where it was based on S.M.'s testimony regarding the beating, Dr. Schieber's testimony regarding S.M.'s injuries and the photographs of S.M.'s injuries. Specifically, S.M. testified that defendant repeatedly struck her with the extension cord with enough force on her bare skin that it was very painful, that she begged him to stop but he refused, and that it resulted in marks and bruises on her back, buttocks, and thighs. Dr. Schieber confirmed that S.M. sustained linear abrasions to her body as a result of being struck by an object. The State also introduced photographs of S.M.'s injuries. As such, the prosecutor's demonstration of the lashings was properly based on the evidence introduced at trial. See *People v. Malone*, 211 Ill. App. 3d 628, 640 (1991) (courtroom demonstrations during closing argument are proper where they are based on the evidence introduced at trial). Moreover, the prosecutor did not conduct this demonstration to improperly shock the jury but, rather, to show how the extension cord, which was not an inherently dangerous object, met the legal definition of a dangerous weapon in the instant case and that S.M. sustained bodily harm as a result of the lashings—two elements the State needed to prove in order to establish defendant's guilt for ACSA. As such, the demonstration was probative of facts in issue and not done for dramatic effect. Moreover, it was done in a manner similar to the actual beating. See *People v. Harp*, 193 Ill. App. 3d 838, 843 (1990) (in-court demonstration should be "probative of

facts in issue and *** conducted under substantially similar conditions and circumstances as those which surrounded the original occurrence").

¶ 76    Fourth, defendant argues the prosecutor created an improper "us-versus-them" mentality by stating the following:

> "When [S.M.] was in that apartment with the defendant on June 28, 2014, other than that baby, she was alone. As the defendant savagely beat her with that belt and that extension cord and raped her, [S.M.] was alone. When she ran to her family looking for help, she was alone. *But here today in this courtroom, [S.M.] is no longer alone. She has the evidence, she has the facts, she has the law, but most importantly she has you. You can stand up for [S.M.]. You can bring [S.M.] justice.* Justice in this case comes when you tell this defendant his lies stop here. Justice in this case comes when you tell this master manipulator you're not going to fall for it. Justice in this case comes when you tell the defendant he is guilty, because that is exactly what he is." (Emphasis added.)

¶ 77    Promoting an "us-versus-them" mentality perverts the "inherent principles of the criminal trial process," such as the presumption of innocence and the impartiality of the jury. *People v. Johnson*, 208 Ill. 2d 53, 80 (2003). A prosecutor improperly fosters an "us-versus-them" mentality by pitting the jury against the defendant or creating "a situation where jurors might feel compelled to side with the State and its witnesses in order to ensure their own safety." *Wheeler*, 226 Ill. 2d at 129. In *Johnson*, the court found a prosecutor's comments that "[w]e as a society do not have to live in [the defendants'] twisted world that they attempt to drag us into," that "[w]e do not have to accept their values," and that "[w]e as a people can stand together" were improper. *Johnson*, 208 Ill. 2d at 79. Similarly, in *Wheeler*, the court found that the State's closing argument improperly

created an "us-versus-them" mentality where the prosecutor (1) characterized himself as a "lone" and "solitary figure" left to "champion the deceased," (2) said he was outnumbered by the defense attorneys, (3) told the jurors that they lived "sheltered lives" away from the "mean streets," and (4) argued that the police witnesses were there to protect the jurors, while defendant's witnesses were not. *Wheeler*, 226 Ill. 2d at 129-31.

¶ 78    Here, in contrast, the prosecutor's comment did not refer to the State or the jury as part of a "we" or "us." When viewed in context, the comments did not suggest that defendant threatened the jury or society in general, but rather focused on the evidence introduced at trial, and reminded the jury that it would be applying the facts to the law and thereby would bring S.M. justice when it signed a guilty verdict. Thus, the State's remarks did not "align the jury with the prosecution" and did not create an "us-versus-them" mentality. Moreover, the State never diverted attention away from the facts of the case and did not attempt to "incite the jury to act out of undifferentiated passion and outrage, rather than reason and deliberation." *Johnson*, 208 Ill. 2d at 79.

¶ 79    Fifth, defendant challenges three comments the prosecutor made during rebuttal argument. First, defendant argues the prosecutor improperly commented on his *pro se* legal performance and suggested that he degraded the court or the proceedings with the following statement:

> "Enough. Enough. It's nothing short of ironic that [defendant] parades around this courtroom making an utter mockery of our criminal justice system, but that's entirely his choice. And we've had enough. Enough of him making a mockery of this courtroom."

¶ 80    A prosecutor may comment on a defendant's constitutional right to represent himself in order to explain defendant's behavior during trial and/or defendant's *pro se* status to the jury. In *People v. Tatum*, 389 Ill. App. 3d 656, 672 (2009), the defendant argued that the prosecutor's

comments penalized him for asserting his right to represent himself. In *Tatum*, the prosecutor stated during closing argument:

"[T]he defendant in this case has chosen to represent himself, and that's his right. Don't hold it against him, but for God's sake, don't hold it against us.

\* \* \*

The defendant in this case has chosen to represent himself in an effort to manipulate—

\* \* \*

The defendant is attempting to manipulate this proceeding to his advantage. Don't you let him do it." *Id.*

The reviewing court found no error in the prosecutor's comments given the circumstances of the case where the defendant continuously spoke out of turn, interrupted the proceedings, and was disrespectful to the court. Moreover, defendant used his *pro se* status to deliver a narrative testimony where he argued irrelevant and inadmissible matters and delivered a closing argument filled with facts that were not in evidence. As such, the reviewing court held that the prosecutor's argument was proper. *Id.*

¶ 81    Here, defendant similarly demonstrated little regard for the rules of evidence by ignoring the court's prior evidentiary rulings, attempting to discuss inadmissible evidence, inserting his own personal feelings into the argument, attempting to argue intoxication as a defense, mentioning his parents' presence in the courtroom, and repeatedly suggesting that the State was hiding evidence. Just as in *Tatum*, the prosecutor's comments here were a proper comment on defendant's behavior in the courtroom.

¶ 82    Second, defendant argues that the prosecutor made a crass insult about the size of defendant's penis.

¶ 83    According to the record, defendant testified and argued that S.M. repeatedly asked him to beat her with a belt and an extension cord, complained that he was ruining the mood by continually seeking her consent to those acts, became annoyed and had an attitude when he could not perform sexually to her satisfaction, and threatened him with reprisal—*i.e.*, a false allegation of sexual assault—when she suspected he had been with another woman. In response, the prosecutor criticized as incredible defendant's testimony and argument that S.M. falsely accused him of sexual assault because, *inter alia*, his penis was either too small or flaccid. We conclude that, in context, the prosecutor was properly arguing the evidence, *i.e.*, defendant's testimony, that was introduced at trial.

¶ 84    Third, defendant argues that the State introduced inadmissible evidence when it told the jury that it "could not present S.M.'s prior statement as evidence because it was a prior consistent statement." Defendant maintains that, with this remark, the State improperly told the jury that S.M.'s prior statement was consistent with her trial testimony.

¶ 85    The jury, however, was already aware that S.M.'s statement to the police was consistent with her trial testimony. Specifically, S.M. testified that defendant repeatedly asked her to change her original statement to the police, wanted her to say that she was not raped, and wanted her to say the police coerced her to falsely implicate defendant, but S.M. never changed her statement. On cross-examination, defendant asked her about her March 6, 2015 letter to him. In that letter, she wrote that she had reviewed her statement to the police for any inaccuracies but could not change anything because she had not lied or exaggerated. S.M. also testified that, even though her

letter to defendant indicated that she still loved him, everything in her original statement to the police was true.

¶ 86     Furthermore, the complained-of comment was made in response to defendant's use during trial of S.M.'s statement to the police and defendant's closing argument, which accused the State of withholding evidence from the jury. According to the record, S.M. testified during cross-examination and on redirect that she never used the word "rape" in her official statement but, rather, used the term "aggravated criminal sexual assault." On re-cross, in an apparent attempt to discredit her by impeachment, defendant referred to page six of her statement, which said, "[S.M.] states when she got there she told Laurie about how Micah raped her." Then, during closing argument, defendant physically held up S.M.'s signed statement to the police and read directly from it to the jury. He also stated:

> "First and foremost, you have been denied *** from hearing everything that pertains to this case. That's the truth. When you go back there, you will be like, well, yeah, we don't have the full conversation. Yeah, there were things they talked about, but we'll never hear it."

In response, during rebuttal argument, the prosecutor stated:

> "Her letter. Go ahead. His Defense Exhibit No. 2. Read each and every word of it because these are the words of a domestic rape victim. And you know what's in here? I didn't lie. I didn't exaggerate the first time. Nowhere in my statement did it say that you raped me. Mr. Impeachment over here. *I couldn't if I wanted to give you her original statement. We're talking about a prior consistent statement.* I can read the little portions of it, but he's impeaching her with the fact that with, oh, by the way, that very last line, you

[S.M.] did say that you [defendant] raped me. Oh, I guess [S.M.] did say that [defendant] raped me." (Emphasis added.)

The record establishes that the prosecutor simply explained to the jury that the State was not hiding evidence; rather, it was following the rules of evidence. Taking into consideration the fact that defendant invited the complained-of comment in his closing argument, he cannot complain that he was prejudiced by the prosecutor's comment. See *People v. Lewis*, 25 Ill. 2d 442, 446 (1962).

¶ 87 Finally, defendant argues that the trial court made an improper comment during defendant's closing argument:

"MR. JEFFERSON [(*PRO SE*)]: Ladies and gentlemen, that's because [S.M.] is into rough sex. If all of the phone recordings were to be played, notice they said there were hundreds of hours, they only gave you maybe one hour, and it's split in between months. That's all they've given you. But if all of them were to be played, you would see what [S.M.] –

MS. ROMITO [(ASSISTANT STATE'S ATTORNEY)]: Objection. Objection to that.

THE COURT: *I'll let you handle that in rebuttal. Go ahead*.

MR. JEFFERSON: You will see the truth. So when you go in there and you listen to the phone calls, watch how they start in the middle. Watch how some of them aren't full. You will see that." (Emphasis added.)

Defendant argues that the trial court erred by commenting, rather than ruling, on the State's objection. According to defendant, the trial court's comment meant that the court "left it unclear to both the jury and [defendant] (who changed course after the judge's comment) as to whether or

not the court was finding his argument proper," and delegated the court's authority to rule on an objection to the State.

¶ 88    We disagree. Defendant did not "change course" after the trial court's comment. Rather, he continued with his same line of argument. Moreover, the record contains numerous instances where the trial court sustained other objections by the State during defendant's closing argument. Thus, if the trial court had intended to stop defendant from making this particular argument, it would have done so. The record clearly indicates that the trial court overruled the State's objection, allowed defendant to continue with his line of argument, and allowed the State to properly respond during rebuttal.

¶ 89                              4. Plain Error

¶ 90    For purposes of our plain error review, among the numerous statement's challenged by defendant, we have found just two errors, which were made during the cross-examination of defendant: first, the prosecutor's sarcastic question asking defendant if he had any acting experience, and second, the remark, "I can understand that with you," which was made in response to defendant's assertion that arguing about the truth with S.M. resulted in bad things happening.

¶ 91    These errors do not rise to the level of plain error. First, the evidence of defendant's guilt was not closely balanced. S.M. testified credibly that he forced her to repeatedly engage in a multitude of sex acts, all the while threatening and/or beating her with a belt and extension cord. She sustained numerous abrasions and bruises as a result of the assault, all of which were documented in photographs, and she told the jury that she did not consent to the beatings or the sex acts. Dr. Schieber confirmed that S.M.'s injuries were consistent with sexual and physical assault. And in a phone conversation with S.M., defendant admitted that he beat and sexually

assaulted her on the morning of June 28, 2014, and threatened to beat her again when she got home from work. The recorded jail phone calls admitted into evidence also showed defendant's attempt to suborn perjury and allowed the jury to hear the tone and inflection of S.M.'s voice and defendant's voice.

¶ 92    S.M.'s testimony was corroborated by the physical evidence of her injuries, defendant's statements during his recorded phone conversations, Dr. Schieber's examination and conclusion that S.M. was the victim of sexual and physical assault, and Laurie L.'s testimony as an outcry witness. Contrary to defendant's argument, S.M.'s March 6, 2015 letter to him—wherein she stated that she did not tell the police that she had been "raped" and that while she was angry with defendant, that did not mean that she did not want to have sex with him—does not demonstrate that the evidence was closely balanced. S.M. was a victim of domestic violence and was still in love with her abuser and was hoping to reunite with him at the time she wrote the letter. Nevertheless, in the same letter, she insisted that everything she told the police in her statement, which detailed the violent sexual assault, was accurate.

¶ 93    Defendant also argues that S.M.'s actions immediately after the assault were "inconsistent with a person who had just been repeatedly beaten and raped." In particular, defendant questions why she did not "flee directly from the house with the child in her arms" but, instead, "took the time" to get dressed, feed the baby, and gather her personal belongings. Defendant's argument lacks merit. The evidence established that S.M. did attempt to flee the apartment naked and without her child in an effort to get away from defendant, but he dragged her back inside and continued attacking her. When defendant finally fell asleep, S.M. quickly took care of her child's needs at her first opportunity to do so, and then put on clothes and grabbed items for the baby before leaving

the apartment forever. S.M. had sufficient time to do these things safely because defendant was asleep.

¶ 94    Defendant also takes issue with the fact that S.M. went to the bank before going to her father's house and rejected Laurie's offer to pick her up. Defendant argues that this "delay" gave S.M. the opportunity to fabricate a story to incriminate him. This argument also lacks merit. S.M. testified that she was in shock after the sexual assault—she did not know where to go or what to do. Still, she knew that she needed to close her bank account before defendant could steal any more of her money, and she knew that she could not safely transport her baby in Laurie's car without a car seat.

¶ 95    Second, based on the totality of the record, the two erroneous remarks by the prosecutor were not so inflammatory or flagrant as to jeopardize the integrity of the judicial process and deny defendant a fair trial. See *People v. Cisewski*, 118 Ill. 2d 163, 175 (1987). Furthermore, the jury was instructed that comments by the attorneys in opening statement and closing arguments should not be considered by the jury as evidence and any statement made that was not supported by the evidence should be disregarded. Similarly, the trial court instructed the jury that it did not "mean to indicate any opinion as to the facts or as to what your verdicts should be" with any ruling or remark it made. Importantly, the jury is presumed to follow the trial court's instructions. *People v. Taylor*, 166 Ill. 2d 414, 438 (1995). In this case, the instructions to the jury, together with the limited nature of the two improper comments, precluded substantial prejudice. The jury verdict would not have been different absent the two erroneous remarks.

¶ 96    The State's two improper comments during defendant's cross-examination do not rise to the level of plain error in light of the overwhelming evidence of defendant's guilt and where neither improper remark denied him a fair trial.

¶ 97                    B. Jury Instruction on Domestic Battery

¶ 98    Defendant argues that the trial court erred in refusing his requested jury instruction for domestic battery as a lesser-included offense of ACSA. Defendant concedes that he forfeited his argument by failing to include it in his posttrial motion. He argues that this court should still consider this issue because it falls under the constitutional issue exception to the forfeiture rule.

¶ 99    While defendant's argument could be construed as a claim that his due process right to a fair trial was violated and that the constitutional issue exception to forfeiture should apply, the Illinois Supreme Court has stated, "Generally, a defendant forfeits review of any putative jury instruction error if the defendant does not object to the instruction or offer an alternative instruction at trial *and* does not raise the instruction issue in a posttrial motion." (Emphasis added.) *People v. Mohr*, 228 Ill. 2d 53, 64-65 (2008); see also *People v. Austin*, 2017 IL App (1st) 142737, ¶ 46 (posttrial motion requirement applies to challenge a jury instruction error). The Illinois Supreme Court has applied the posttrial motion requirement to the very type of challenge defendant raises here, *i.e.*, a jury instruction error.

¶ 100   Forfeiture aside, a review of the crimes shows that defendant was not entitled to his proffered instruction. There are two steps to this analysis:

"First, *is* the convicted offense indeed a lesser-included offense at all? To answer that question, we must examine the charging instrument and determine whether it sets forth a broad foundation or main outline of the lesser-included offense. Second, was it *proper* to

find defendant guilty of this lesser-included offense? To answer that question, we must examine the evidence adduced at trial and determine whether it rationally supports a guilty finding. (Emphasis in original.) *People v. Baldwin*, 199 Ill. 2d 1, 14-15 (2002).

¶ 101 Whether a charged offense encompasses another as a lesser-included offense is a question of law, and is reviewed *de novo*. *People v. Landwer*, 166 Ill. 2d 475, 486 (1995). A reviewing court reviews a trial court's decision to deny a proposed jury instruction under the abuse of discretion standard. *People v. Davis*, 213 Ill. 2d 459, 475 (2004).

¶ 102 In determining whether a crime is a lesser-included offense, we first examine the charging instrument. See *People v. Kolton*, 219 Ill. 2d 353 (2006). "[W]hether a particular offense is 'lesser included' is a decision which must be made on a case-by-case basis using the factual description of the charged offense in the indictment." *Id*. at 367. "A lesser offense will be 'included' in the charged offense if the factual description of the charged offense describes, in a broad way, the conduct necessary for the commission of the lesser offense and any elements not explicitly set forth in the indictment can reasonably be inferred." *Id*.; 720 ILCS 5/2-9 (West 2014) (a lesser-included offense is proven by lesser facts or a lesser mental state, or both, than the charged offense).

¶ 103 The State proceeded to trial on Counts 1, 5, 7-8, 10-11, 15, 17-18, and 20. In Counts 1, 5, 7, 8, and 10, defendant was charged with ACSA in that he committed various acts of sexual penetration upon S.M. by the use of force or threat of force and used a dangerous weapon. In Counts 11, 15, 17, 18, and 20, defendant was charged with ACSA in that he committed various acts of sexual penetration upon S.M. by the use of force or threat of force and caused bodily harm to S.M.

¶ 104   Here, defendant's proffered instruction for domestic battery was based on family or household member status. However, the charging instrument only included the elements of sexual penetration, use of force or threat of force, and bodily harm. Thus, defendant's proffered element of family or household member status was not identified by the broad foundation or main outline of the charging instrument here and could not have been inferred from the charging instrument itself. Thus, as a matter of law, defendant's proffered instruction was not a lesser-included offense based on this charging instrument because, by definition, a lesser-included offense is one that does not have any element not included in the greater offense. *People v. Jones*, 149 Ill. 2d 288, 292 (1992).

¶ 105   Even if it could be concluded that the indictment set forth a sufficiently broad foundation to find that the domestic battery offense could be lesser-included, defendant's argument fails at the second step of the analysis. See *Kolton*, 219 Ill.2d at 359 (where a court determines that the uncharged offense is a lesser-included offense of the charged crime, a court then moves on to the next step, which is an examination of the evidence adduced at trial). Step two is an independent prerequisite that must be met before defendant is entitled to an instruction. *Baldwin*, 199 Ill. 2d at 6. Thus, even where a court determines that a crime is a lesser-included offense, it does not automatically follow that a jury must be instructed on the lesser offense. This is because, even if the crimes are included, a court must still determine whether the evidence at trial is such that a jury could rationally acquit defendant of the greater offense and find defendant guilty of the lesser. Only then will a jury actually receive a lesser-included offense instruction. See *People v. Garcia*, 188 Ill. 2d 265, 278-82 (1999).

¶ 106   Here, the evidence showed beyond a reasonable doubt that defendant committed various acts of sexual penetration against S.M. by the use of force or threat of force, used a dangerous weapon, and caused bodily harm to S.M. S.M. testified clearly that defendant put his penis into her mouth, put his penis into her vagina, put his penis into her anus, put his finger into her anus, and put his finger into her vagina all while threatening or beating her with a belt or extension cord, which resulted in bruises and abrasions to her body. S.M. further testified that she did not consent to any of these sexual acts or physical beatings. Defendant testified that S.M. not only consented to, but initiated, all of the various forms of sexual penetration and lashings. The jury clearly rejected the notion that there was consent and found that there was sexual penetration, so defendant was not entitled to the domestic battery instruction. See, *e.g.*, *People v. Austin*, 216 Ill. App. 3d 913, 917 (1991) (although offense was included, since evidence showed defendant was guilty of the charged offense, no lesser instruction was required). Ultimately, here there is no reversible error where no rational jury would have concluded on this evidence that defendant was only guilty of domestic battery. See *e.g.*, *People v. Mitchell*, 105 Ill. 2d 1, 14 (1984) (refusing to consider defendant's complaint that the trial court refused a jury instruction on simple battery where defendant was charged and found guilty of aggravated battery for beating her child).

¶ 107                    C. Admissibility of S.M.'s Letters

¶ 108   Defendant argues that the trial court erred in rejecting his request to admit several letters S.M. wrote to him while he was in jail. He argues that those letters were relevant to his defense because they demonstrated that S.M. consented to the sexual activity between them on the morning of June 28, 2014, and impeached her credibility because she testified that she did not consent.

¶ 109    The admissibility of evidence at trial is a matter within the sound discretion of the trial court, and that court's decision may not be overturned on appeal absent a clear abuse of discretion. *People v. Mayberry*, 2020 IL App (1st) 181806, ¶ 39. Such an abuse of discretion will be found only where the trial court's decision "is arbitrary, fanciful or unreasonable to the degree that no reasonable person would agree with it." *People v. Rivera*, 2013 IL  112467, ¶ 37. A trial court is charged with the responsibility of determining whether evidence is relevant and admissible. *People v. Morgan*, 197 Ill. 2d 404, 455 (2001). Evidence is deemed relevant "if it has any tendency to make the existence of any fact that is of consequence to the termination of an action either more or less probable than it would be without the evidence." *Id*. at 455-56. Importantly, a trial court has broad discretion to exclude irrelevant evidence. *People v. Bohn*, 362 Ill. App. 3d 485, 490 (2005).

¶ 110    The trial court properly ruled that the excluded letters were neither relevant nor impeaching. The content of the letters did not tend to show that S.M. consented to the forced violent sexual penetration with which defendant was charged. As the trial court explained, while the letters showed that S.M. consented to nonviolent sex with defendant in the past and described nonviolent sexual fantasies with him in the future, the letters did not suggest in any way that she enjoyed rough sex or that she and defendant previously had rough sex. Specifically, the letters did not state that defendant hit her with a belt or extension cord before or that she enjoyed those acts. Consequently, the letters were not relevant to the issue of whether S.M. consented to the violent sexual assault at issue in this case.

¶ 111    Nor, as the trial court explained, did the letters impeach S.M.'s testimony in any way. She testified that she previously had consensual sex with defendant and continued to love him and

wanted to have a relationship with him after he was arrested. S.M.'s letters were not impeaching because the content of her letters was consistent with her testimony.

¶ 112 Defendant argues that S.M.'s letters should have been admitted because the tone and substance of her letters "differed sharply" from her phone calls with defendant and the jury should have been allowed to consider the "inconsistencies between these two different modes of communication" especially since S.M. was aware that their calls were being recorded but did not think that anyone would read their letters. We disagree. It is reasonable to infer from the evidence that S.M. was more comfortable writing about their sex life in letters than talking about their sex life over the phone. Moreover, she testified that although she knew their phone calls were being recorded, she did not think that anyone would really listen to them. As such, defendant's argument is not supported by the record.

¶ 113 We conclude that the trial court did not abuse its discretion in determining that S.M.'s letters to defendant—aside from her March 6, 2015 letter, which was admitted into evidence— were neither relevant nor impeaching.

¶ 114                                    D. Cumulative Effect of Alleged Errors

¶ 115 Contrary to defendant's assertion, there is no cumulative effect that deprived him of a fair trial. "[T]he whole can be no greater than the sum of its parts" (*People v. Albanese*, 102 Ill. 2d 54, 82-83 (1984)), and where there is no reversible error on any individual issue, the alleged errors cannot cumulatively warrant a new trial (see *People v. Thomas*, 137 Ill. 2d 500, 549-50 (1990); *People v. Phillips*, 127 Ill. 2d 499, 542-43 (1989)).

¶ 116                                         III. CONCLUSION

¶ 117 For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 118   Affirmed.